SISTERS OF MERCY *v.* TOWN OF HOOKSETT.

*Hughes & Burns* (*Mr. Walter A. Calderwood* orally), for the plaintiffs.

*Robert W. Upton* and *Richard F. Upton* (the former orally), for the defendant.

PAGE, J. I. The plaintiffs own real estate in Hooksett which they use and occupy for two schools, one of preparatory rank, the other called Mount Saint Mary College. The latter is empowered to confer degrees. Laws, 1934 spec. sess., *c.* 14. Real estate is not taxable when used exclusively for educational purposes by "seminaries of learning." R. L., *c.* 73, *s.* 7. The defendant advances a novel interpretation of the quoted phrase: a "seminary," as specifically defined in some dictionaries, is a school of preparatory or precollegiate rank. Upon this interpretation, the plaintiffs could claim the benefit of the general educational exemption only as to so much of their real estate as is used and occupied by their preparatory school, while as to that devoted to the uses of the college, they must pay taxes.

Doubt is cast upon this interpretation by the fact that the word "seminary" has a general meaning as well as a specific one. The New Standard Dictionary defines it as "A place of education: used

commonly of a special school, as of theology or pedagogics, or of a school of academy grade. . . ." The same work defines "academy" in both the general and specific manner: "A place of instruction or training. Specif.: (1) A school intermediate between a common school and a college. (2) Any institution where the higher branches are taught, or where pupils are trained in some special science or art; as the U. S. Naval *Academy*." The word "academe" by which an earlier generation fondly described their college, is "Any place of academic study." And "academic" is "Of or pertaining to an academy, college, or university." Webster defines "seminary" as "A place of education, as a school of a high grade, an academy, college, or university."

The question is whether the Legislature used the phrase in its general, broad sense; or had in mind only those schools specifically chartered as "seminaries," of the preparatory grade, and other schools of similar grade chartered as "academies." The use of the phrase "seminaries of learning" in our tax statutes originated in 1842. R. S., *c.* 39, *s.* 2. At that time the Legislature had chartered six preparatory schools under the corporate name "Seminary," and several times that number under the name "Academy." One of these was Gilmanton Academy. Just a few years before 1842, this academy had opened a department known as Gilmanton Theological Seminary, to which students were admitted only if graduates of a preparatory school. A few of the students had college degrees. If not a post-college school, the seminary was surely of post-preparatory rank. Upon the narrow construction now argued, the real estate used by Gilmanton Academy would have been exempt, while that used by the seminary would have been taxed. That the Legislature could have intended that an academy was a seminary of learning while a seminary of higher learning was not, is greatly to be doubted.

Specifically did the Legislature in 1842 intend to tax the only New Hampshire educational institution of the day that gave degrees — Dartmouth College? The answer will indicate what they meant by "seminaries of learning." Unquestionably they meant what the framers of the Constitution meant when they provided that it should be "the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of literature and the sciences, and all seminaries and public schools." Const., Part 2, *art.* 83. There is ample proof that "seminary" was used in 1784 in the general sense. The Convention of 1781, which originated the constitutional phrase issued an address to the people in which they

said (*p.* 15): "From the deepest impression of the vast importance of *Literature* in a free government, we have interwoven it with, and made its protection and encouragement a part of the Constitution itself."   This indicates no narrow definition of the word "seminary."

In the years 1781–1784, while the Constitution was being debated and adopted by the people, there was in New Hampshire no single educational institution known specifically as a "seminary."   The only two existent institutions to which the word "seminaries" could apply were Phillips Exeter Academy and Dartmouth College, and there is no evidence of an intention to cherish Exeter and to neglect Dartmouth.

The common language of the day called Dartmouth a "seminary," just as the Latin catalogues of the College used the root of academy in the general sense — "Catalogus Senatus Academici."   In 1770, Samson Occum, addressing Eleazar Wheelock, founder and first President of Dartmouth, spoke of "your Seminary."   Richardson, History of Dartmouth College, 114.   Eleazar Wheelock, by the charter of the College, had power to nominate his successor.   He died in 1779, and by will nominated his son John and gave him all his right "to said seminary."   Farrar, Report of the Case of the Trustees of Dartmouth College against William H. Woodward, 200. In 1787 John Quincy Adams, then at Newburyport near our border, wrote in his diary that a certain "son of Dartmouth" was like "all the young gentlemen from that seminary" in "effervescence and manners."   Richardson, *op. cit.*, 277.   Dr. Belknap referred to Dartmouth College as "a seminary of literature."   History of New Hampshire, II, 349 (published in 1791).

Officially the State several times recognized Dartmouth as a seminary.   In 1789, President John Wheelock prayed the Legislature for a land grant to the Trustees of the College "for the benefit of that Seminary."   The Legislature made it expressly "for the benefit of that Seminary."   21 State Papers, 395, 476; 22 State Papers, 694.   And in 1792 the President and Council of the State gave the Trustees of the College authority to sell any part of the land granted, if they thought it "beneficial to said Seminary," 22 State Papers, 505.   In 1807 Dartmouth College had from the State another grant of land for "that Seminary."   Laws, June, 1807, *p.* 34.

In 1816, the Legislature attempted to amend the charter of the College and make it into a University.   The preamble of the act recited their constitutional duty "to cherish . . . all seminaries" as the ground for their action.   Laws, June 1816, *c.* 35.   This project

had been brought to legislative attention in a memorial from President John Wheelock, in which he referred to Dartmouth College as "this Seminary." A special legislative committee appointed to consider the memorial reported "It was at once perceived, that the administration of public seminaries" involved too much for a full investigation. Documents Relative to Dartmouth College Published by Order of the Legislature, 4, 9.

So far, everybody since the organization of the College, had referred to it as a seminary. In 1816 John B. Wheeler gave the College $1,000 for "your respected seminary." Richardson, *op. cit.*, 361. In the war of pamphlets in 1815 that preceded the legislative act of 1816, John Wheelock complained of the Trustees as "these guardians of the seminary." Sketches of the History of Dartmouth College, 15. Elijah Parish, his collaborator, spoke of the College as "a seminary of learning." A Candid, Analytical Review, 15.

When the Dartmouth College case came on for argument in the Superior Court in September, 1817, Jeremiah Mason, for the College, warned that "If our seminaries of learning" were to become the prey of prevailing political parties, their usefulness would be destroyed. Jeremiah Smith, on the same side, spoke of the College as "this literary seminary." For Woodward, George Sullivan said that the constitutional duty of the legislators "to cherish . . . all seminaries" extended to Dartmouth College. Farrar, *op. cit.*, 70, 100, 104. Timothy Farrar, in his "advertisement" to the work cited, called the College "that seminary."

The use of the general term "seminary" in connection with the College continued for some time, but the people connected with the institution came in time to refer to it by its charter name College, which distinguished it from the "seminaries" that were springing up as preparatory schools. In 1829, "Vermont" referred to the College, nevertheless, as "this Seminary." Dartmouth College and the State of New Hampshire.

In connection with taxes and military service, the Legislature classed college and academy together. When they called on selectmen to send inventories of polls, they excepted alike the "president, professors, tutors, instructors and students of Colleges . . . and preceptors of academies." Laws, June, 1812, *c.* 50; Laws, June, 1824, *c.* 10. When they exempted the polls of students of the College (Laws, Nov. 1812, *c.* 13) it could hardly be that they thought they were not attending "a seminary of learning." When they exempted from taxation "students of academies and other incor-

porated literary seminaries in this state" (Laws, 1818, c. 66), they could not have meant to exclude Dartmouth College as not a literary seminary. Finally when, shortly before 1842, they voted that individuals who left home to attend "an academy, college or other literary institution" in the State, should not be taxed, held to military duty, or allowed to vote in the place where such "academy, college or literary institution is situated," they clearly classed the only college of the State as a literary institution, of different rank but of the same general description as academies. Laws, 1839, c. 447. In the Revised Statutes, c. 40, s. 2, this provision as to the taxation of students "at any literary institution" is continued, but without specific mention of colleges and academies. The revision was obviously intended to substitute general classes for specific enumerations.

We think it clear that "seminaries of learning" as used in our statute includes Mount Saint Mary College, and that the real estate used by the College exclusively for school purposes is not liable to be taxed under the provisions of P. L., c. 60, s. 5; R. L., c. 73, s. 7.

II. The second question of law transferred without ruling is whether the plaintiffs are entitled to an additional exemption of $150,000 on its Hooksett real estate under R. L., c. 73, ss. 24, 25. Such an additional exemption is permitted as to real estate not a part of the seminary, provided it is "owned and occupied by [them] their officers, or their students for the purpose for which they are incorporated." *Trustees of Phillips Exeter Academy* v. *Exeter*, 90 N. H. 472, 503. The question as to this additional exemption assumes particular importance here because of the untaxed property of the plaintiffs elsewhere than in Hooksett. To the extent that the plaintiffs have in fact enjoyed the benefit of this $150,000 exemption outside of Hooksett, may they claim it in these proceedings? The answer is clearly in the negative.

It is agreed by both parties that the $150,000 exemption is single and that it applies to the corporation. It is therefore immaterial for purposes of this case that the Legislature has not seen fit to provide for the allocation of this exemption as between two or more towns in which the plaintiffs have real estate. To the extent that the plaintiffs have had the benefit of this institutional exemption elsewhere, they may not have it in Hooksett. The exemption is not of $150,000 in each town, but of $150,000 in all, unless under R. L., c. 73, s. 26 the exemption be increased by municipal action. Neither Manchester nor Nashua could increase the exemption without a vote

of the city government and the approval of the mayor. No such vote is shown in the record as it now stands. We do not have to resolve the difficult question whether, if the Manchester exemption were increased, the value of the non-seminary and non-charitable property in Manchester must be related first to the initial exemption of $150,000 or to the increase of that exemption. Again we remark that the failure of the Legislature to provide for the allocation of the exemption does not, upon the record, afford any material obstacle to the decision of this case.

It results that the findings made by the Court as to the market value of the plaintiffs' real estate in Manchester were material, so the third (double) question transferred without ruling must be answered.

III, a. Is the chapel in Manchester a house of public worship and not liable to be taxed under R. L., c. 73, s. 7? It is found that the chapel "is used daily by the Community and novitiates for religious services in about equal proportional values. On Sundays the sisters, convent visitors, and residents of petitioner's Manchester institutions attend divine services. The public does not attend these services because diocesan and parish regulations require parish members to attend their own church services."

It is argued for the defendant that "houses of public worship" include only "such buildings as were then [1842] usually and popularly termed churches and used for the encouragement of religion and piety, which in the Bill of Rights (*art.* 6) it is declared 'will give the best and greatest security to government.'" *St. Paul's Church v. Concord*, 75 N. H. 420, 424. In that case the question was whether the plaintiff's parish house was a public house of worship, in spite of the fact that it was used frequently for non-religious purposes. It was held that it was such a house, because religious services were the primary use of the building.

The plaintiffs' chapel at Manchester, it is said, is not such a house, in spite of its primary religious, indeed its sole, use for religious services, because it is not a "church" in the accepted sense. Neither, for that matter, was the St. Paul's Parish House; St. Paul's had a church of that sort entirely separate from the Parish House. In that case this court said: "Argument is unnecessary to show that the purpose [of the statute] was to promote religious worship, and not to discourage it by limiting the exemption to the very small number of church buildings in the state in which no secular entertainments were permitted." *Supra*, 424. The chapel now in question clearly would rank with one of "the very small number" devoted exclusively to

the worship that it was the primary object of the statute to stimulate as a security to government.

But it is further urged that the chapel is not "public." Perhaps if this were a private oratory for the use of one's family and invited guests (except in a parsonage) it would be taxable, but that need not be decided. It is enough to say that "public" distinguishes a case from a private use. We think that a place of worship to which are admitted students of the plaintiffs' educational institution, residents of their charitable homes, and their visitors is not private, but public. If members of Roman Catholic parishes are by rule expected to attend their own parish churches, and not another, surely that limitation does not make any one of those parish churches less public than if there were total freedom of individual Roman Catholics to attend worship wherever private whim led them. The seeming importance of the limitation thus vanishes. The chapel is no less public for those assigned to it and regularly attending it than any parish church is to those assigned to it by diocesan and parish rule.

The object of the Bill of Rights to foster religion and piety as "the best and greatest security to government" is met by the chapel in its own small sphere as aptly as by each parish church in its larger way. Its use is not private as opposed to public. By analogy, the test of the public character of a charitable institution is not that all of the public is admitted to its benefits, but that an indefinite number of the public are so admitted, that its benefits are not restricted to its corporate members and that those members have no pecuniary interest in the property from which they can profit. *Young Women's Christian Association* v. *Portsmouth*, 89 N. H. 40; *Portsmouth Historical Society* v. *Portsmouth*, 89 N. H. 283. *Society* v. *Exeter*, 92 N. H. 348, 356. See also *Chung Mee* v. *Healy*, 86 N. H. 483. The same tests of public character are fully met with regard to this chapel. It is not used solely by the plaintiffs or their private guests, and is not used at all for the profit of the members of the order; there is free admission for that indefinite portion of the public who are the beneficiaries of the educational and charitable institutions conducted by the plaintiffs. In our opinion the chapel at Manchester is exempt as a public house of worship. It is not used as a mere vacation house or a rest house, as was the case in *Woodstock* v. *The Retreat*, 125 Conn. 52, but as an adjunct to educational and charitable institutions. In the Connecticut case the court declined to discuss the question whether the chapel in the rest house was exempt, the only

question raised being whether the whole house, of which the chapel was but a small part, was a house of worship, which it clearly was not.

But even if the chapel at Manchester were not a house of public worship, its services, as appears from the finding, are attended by the students in the plaintiffs' normal school. It seems that it might qualify in the alternative as a place for religious instruction as a part of an exempt seminary of learning under R. L., c. 73, s. 7. *Trustees* v. *Exeter*, 90 N. H. 472, 476, 505.

b. Is the normal school for novitiates in Manchester a seminary of learning? In this school "young women with high school background" have normal and religious training and instruction in domestic sciences and housekeeping. The argument that this post-preparatory school is not a seminary of learning within the purview of the exemption from taxation has already been rejected as to Mount Saint Mary College. So much of the real estate in Manchester as is used exclusively for normal and training school purposes is exempt from taxation.

IV. The defendant excepted to the failure of the Court to find or state the "test for determining the value of this property." The contention that specific subsidiary finding or rulings should have been made upon the wholly general request made by the defendant is disposed of in the opinion in the case of *New Hampshire Savings Bank* v. *Bank*, decided this day, *post*, 326.

After the findings and rulings now excepted to were filed, the defendant requested certain rulings as to the tests to be applied. They were denied, for the reason that they were not seasonably filed. The defendant now argues that they were seasonably filed, because no decision has even yet been made. The statutory provision that the Court "shall, if either party request it, give his decision in writing, stating the facts found and his rulings of law, which shall be filed and recorded" (R. L., c. 370, s. 13), refers to the decision already written, filed and recorded before the requests were made. The requests were not seasonably made.

But in any event the aim of the requests was to establish as a test of market value what the plaintiffs would have paid for the property had it been owned on assessment day by a third party. It was this test that was rejected in *Phillips Exeter Academy* v. *Exeter*, 92 N. H. 473, after the fullest argument by the counsel in this case. A petition for rehearing was at that time denied. We would have had no particular disposition to reconsider the question even if the present exception had properly raised it.

V. The defendant's motion to dismiss all of the petitions for abatement other than those of 1938 and 1939 was denied. The defendant alleges no other grounds for dismissal than that (a) the plaintiffs offered no evidence to show that the taxes assessed were disproportional to that of other property in Hooksett, and (b) no cause for abatement has been shown. As to (a) it is urged that the plaintiffs offered no evidence to show the assessed value, or the true value, of any other property in Hooksett, and cites *Clark* v. *Middleton*, 74 N. H. 188. In that case abatement was sought on the specific ground that the assessed valuation of the plaintiffs' property was not in proportion to that of other property in the town. Since the disproportion alleged had to be shown, the plaintiffs had the burden of proof and could not rely on the assumption that other property in the town was appraised "at its fair market value." These petitions, however, present an entirely different issue. The plaintiffs undertook only to prove that they were exempt. To do that they did not have any occasion to claim that their property was valued disproportionately. If they succeeded, as to any part of their property, in establishing an exemption not granted by the assessing officers, they were entitled to so much of an abatement. Exemption is as good a ground for abatement, to the extent shown, as is a disproportional assessment, unless the defendant, if in position to do so, went forward with evidence that its officers had assessed the property disproportionately, which was no part of the plaintiffs' claim. Since neither party put that in issue, the defendant's claim that the plaintiffs did not sustain the burden of proof is untenable.

VI. The defendant excepted to a number of findings and rulings made by the Court.

a. The finding that the cost of the school buildings at Hooksett was $246,987.90. This the Court itemized thus: main building erected in 1909, $204,903.42; finishing top floor in 1920 and 1925, $26,628.24; water tower in 1924, $15,456.24. It was also found that the reservoir dam cost about $1,800 in 1909 and was replaced in 1941 at a cost of $3,751.07. These figures accurately state the testimony, based upon the plaintiffs' books, concerning actual construction costs. It is suggested that they do not include the architect's fee, which it is argued would approximate $15,000. If there was any evidence concerning an actual architect's fee, it has escaped us. Apparently the defendant relies upon the testimony of one of its experts, who estimated reproduction costs, in which he included seven per cent for the architect, but which he said would not apply

"on the whole business, just part of it." The precise figures, if any, that should be added on this account, is thus left largely to guesswork. The finding made is amply sustained by the evidence. If there were in fact any architect's fee, it does not necessarily follow that a finding of the amount would in any material way affect the use of the original construction costs as bearing on present market value.

b. The exception to the finding of the market value of $165,000 for the buildings stands no better. Testimony that bore on the finding was, as is usual in such cases, widely conflicting. On the one hand there was testimony that costs of construction had risen only thirteen per cent; on the other were estimates of present reproduction costs ranging from $462,000 to $700,000, approximately two or three times the original cost. Depreciation was just as widely estimated, from fifteen per cent to fifty per cent. The weight of this testimony was for the Presiding Justice (who was the supreme assessor), and his finding of present market value was within the testified limits.

c. The defendant excepted to the ruling that the Taylor land, the Thompson land and the Poor property, all in Hooksett, are qualified for inclusion in the institutional exemption of $150,000. The Taylor land, of about twenty-five acres of wood and farm land (deducting five acres allotted by the Court's findings to the campus of the school and college) does not appear affirmatively to be occupied "for the purposes for which they are established." R. L., c. 73, s. 24. The twenty-five acres are not therefore qualified; they were not found to be a part of the campus. See *Trustees of Phillips Exeter Academy* v. *Exeter*, 90 N. H. 472, 506; 92 N. H. 473, 477. The ruling was erroneous in this respect. The Thompson land of thirty-seven and a half acres was formerly in part used for a golf course in connection with the educational institutions. The portion so used was "recently" plowed and seeded, and the use for a golf course abandoned for the time. The word "recently," according to the undisputed testimony, refers definitely to the fall of 1941, after the last assessment now involved. Consequently the portion so used was exempt, for the purpose of these cases, as a part of the seminary under the rule stated in the *Exeter* case, 90 N. H. 472, 506. A division in value should be made between the portion thus exempt and the rest of the Thompson land, which, not being occupied for institutional purposes, is taxable. *Hedding &c. Association* v. *Epping*, 88 N. H. 321. The Poor property, being rented and not occupied for institutional purposes, is taxable. The defendant's exceptions as to

the Taylor land and the Poor property are sustained. Though the portion of the Thompson land used for a golf course would properly be exempt, as part of the seminary, the plaintiffs have no exception to the ruling that the Thompson land qualifies for the institutional exemption of $150,000. That ruling will stand as the law of the case as far as the golf course is concerned, for the purposes of these petitions. In the result, the plaintiffs lose nothing, since they have no exception to the ruling including the Thompson land in the property qualified for the $150,000 exemption. The defendant loses nothing because, as to the golf course, it was entitled to have that land in no worse situation as to exemption. The defendant's exception is sustained as to the portion of the Thompson land not used for a golf course, and is overruled as to the part so used.

VII, a. The plaintiffs excepted to the denial of their request for a finding that the chapel in their building at Hooksett was used for religious services for the benefit of the students and the public for more than six months of each calendar year. The Court found that "petitioner does not conduct religious services in the chapel at Hooksett for the benefit of the public. The services are conducted for the benefit of the students, teaching and domestic members of the Community, and lay teachers who care to attend." This finding was intended, apparently, to deny the claim that the chapel is a house of public worship. It seems clear that the chapel for the benefit of the somewhat limited group named is for the benefit of a class or group of the public in the sense already discussed in connection with the Manchester chapel. A house of worship does not become private unless the benefit is restricted pretty definitely to the group of members, with no substantial indefinite part of the public regularly admitted to the benefits. The exception is sustained.

This chapel seems, upon the finding, to have been used for religious instruction in connection with the seminary, and as a part of it. If so, it would be exempt even if not a house of public worship. *Trustees* v. *Exeter*, 90 N. H. 472, 476, 505. It would be inconsistent to hold that property devoted to religious education is any less a part of the seminary than a gymnasium or an athletic field devoted to physical education.

b. For reasons already indicated, the Court properly admitted testimony concerning the plaintiffs' property in Manchester and Nashua and properly denied the plaintiffs' motion to strike out all such testimony.

c. The plaintiffs excepted to the finding that the campus com-

prised only twenty acres. They urge that the reservoir, used for a water supply for the seminary and for skating by the students in winter, also the golf course, should be included in the campus. But that does not conclusively appear. If those properties should have been treated as parts of the seminary, the exception to the finding as to the campus does not raise the question of their status as parts of the educational plant.

d. The petitions for abatement of the taxes for 1938 and 1939 were dismissed on the ground that they were not made within six months of notice of the assessment. The plaintiffs claim accident, mistake and misfortune, but since the six months' provision is in the nature of a statute of limitation, the claim is immaterial. *Larkin* v. *Portsmouth*, 59 N. H. 26. The Court found that the plaintiffs admitted the receipt of the tax bill for 1938 on July 11, and that admission is actually made in the plaintiffs' petition for abatement filed on January 12, 1939. Further it is in evidence that the collector of taxes received the warrant on June 30, 1938, and that his custom was to have all bills mailed to the taxpayers within seven days. The finding that "the facts speak for themselves" is supported by sufficient evidence. It is uncontradicted that the petition concerning the 1939 taxes was not filed until 1942. The dismissal was proper.

e. The plaintiffs excepted to many of the findings of market value and use made by the Court, urging that the valuations are clearly in excess of true value. Our attention has been called to no evidence that is conclusive of the claim made, and we have found none.

All of the plaintiffs' exceptions are overruled, except that relating to the exemption of the Hooksett chapel.

*Case discharged.*

All concurred, except JOHNSTON, J., who was of the opinion that the defendant is correct in its contention that the test of value established in that part of R. L., c. 76, s. 1 added by the amendment of 1872 is what the owner would pay rather than lose the specific property.