Board of Tax and Land Appeals
No. 92-595

APPEAL OF THE CITY OF FRANKLIN

(New Hampshire Board of Tax and Land Appeals)

September 22, 1993

*Fitzgerald & Sessler, P.A.*, of Laconia (*James N. Sessler* on the brief and orally), for the City of Franklin.

*Stanley H. Robinson*, of Franklin, on the brief and orally, for the Franklin Home for the Aged.

BROCK, C.J.   The City of Franklin (the city) appeals the decision of the New Hampshire Board of Tax and Land Appeals (the board) that the Franklin Home for the Aged (the home) qualifies for a charitable tax exemption pursuant to RSA 72:23 (1991). We affirm.

From 1938 to 1989, the home was classified as tax exempt by the city. In 1989, the city denied the home's annual request for exemption pursuant to RSA 72:23, and the home appealed to the board. Following a hearing, the board found that the home had successfully established the criteria necessary for status as a charitable organization and ruled that it continues to qualify "for the 100% property tax exemption [it has] received from the day of its inception more than fifty years ago." On appeal to this court, the city contends that the evidence before the board failed to establish that the services the home performs are obligatory and, therefore, that the board's decision must be overturned.

The home is a non-profit organization which was formed as a voluntary corporation on October 5, 1938. The Articles of Agreement state the purposes for the corporation as

"the establishment and maintenance of a home for the aged . . . and to receive and carry out the bequests made by Anna

G. Blodgett, Mary A. Rowell, Clara E. Rowell, Eliza T. Shepard and such other persons who may bequeath or give property for the support of elderly people of Franklin and the towns in the neighborhood of Franklin . . . . Said corporation is also formed for the general charitable purpose of assisting and aiding worthy aged people in Franklin, and if funds are available, in the towns in the neighborhood of Franklin."

The home has an endowment of over $800,000, which generates income of approximately $55,000 a year. The rates charged by the home are set based upon expenses and are reduced by the contribution of the income from its endowment. Each year the directors of the organization vote how much of the income will be used to subsidize the overhead and expense of caring for its residents. Money that is not used to reduce the rates is used to make repairs and improvements to the buildings. The administrator of the home testified before the board that the home's only purpose is to provide nursing care for its aged residents at the lowest cost possible.

The home has been, since at least 1950, a charitable organization exempt from federal income tax pursuant to section 501(c)(3) of the United States Internal Revenue Code. The home does not generate a profit and has no stockholders to whom dividends are paid. Its officers are not paid for their services, and the wages and salaries of the home's employees are lower than market compensation for the same services at several area nursing facilities that operate for profit. The cost of care at the home is between fifteen and twenty percent less than the for-profit nursing homes.

The home does not receive Medicaid or Medicare and, thus, is able to serve elderly individuals whose income is too high to qualify for Medicaid but not sufficient to pay the more expensive rates of the for-profit homes. When a resident is admitted to the home, the resident agrees that when his or her funds run out, that individual will transfer to a Medicaid facility. The home does continue to care for residents until they are accepted at a Medicaid facility, and that interim care, which lasts on average from three to four months, is at no charge to the resident.

Testimony before the board established several instances in which the directors of the home voted to provide additional special financial treatment to its residents. In one instance the home offered to subsidize by fifty percent the care of a resident who was 106 years of age because her children were unable to pay the cost of her care due to their own advanced age. In another instance, the home fully subsi-

dized a resident who was unable to pay her bill, which cost had already exceeded the amount of $14,000. In yet another instance, a resident who was no longer able to pay the home's rates, but did not qualify for acceptance at a Medicaid facility because she did not meet the level of care required, was allowed to stay at no cost for at least twelve years. In addition, there was testimony that in some cases the home holds beds for residents who require temporary hospitalization, even if the residents are unable to pay both the hospital costs and the cost of the bed at the home. The bed is held at no cost until a determination is made by a physician that the resident will not be returning.

The city does not contest the board's findings that the home has a charitable purpose, that it provides a charitable service to the general public or to an indefinite group, and that it has no income or profit accruing to the members of the organization. The city argues, however, that, pursuant to RSA 72:23, the home is required to prove that its service of providing low cost subsidized care to the elderly is an obligation enforceable by the attorney general or other public official. The city contends that because there was no evidence that the home's income must be used to subsidize the rates, there is no proof of an enforceable obligation to provide the charitable service.

The home argues that under the terms of its charter its purpose is to run a home for the aged which is, by statutory definition, a charitable institution. In addition, it argues that the obligation enforceable by the attorney general is established by evidence that the charter has for fifty-five years been exclusively interpreted as having the charitable purpose of providing care for the aged at the lowest possible cost. We agree with this latter contention.

RSA 72:23 provides:

> "The following real estate and personal property shall, unless otherwise provided by statute, be exempt from taxation:
>
> . . .'
>
> V. The real estate and personal property owned by charitable organizations and societies organized or incorporated in this state or having a principal place of business in this state, and occupied and used by them for the purposes for which they are established, provided that none of the income or profits thereof is used for any other purpose than the purpose for which they are established."

RSA 72:23-*l* (Supp. 1992) defines the term "charitable" as follows:

"The term 'charitable' as used to describe a corporation, society or other organization within the scope of this chapter, including RSA 72:23 . . . shall mean a corporation, society or organization established and administered for the purpose of performing, and obligated, by its charter or otherwise, to perform some service of public good or welfare for the benefit of the general public, or a substantial and indefinite segment of the general public, with no pecuniary profit or benefit to its officers or members, or any restrictions which confine its benefits or services to such officers or members, or those of any related organization. The fact that an organization's activities are not conducted for profit shall not in itself be sufficient to render the organization 'charitable' for purposes of this chapter, nor shall the organization's treatment under the United States Internal Revenue Code of 1986, as amended. This section is not intended to abrogate the meaning of 'charitable' under the common law of New Hampshire."

The term "obligation," in the context of charitable organizations, was first used by this court in *Society of Cincinnati v. Exeter*, 92 N.H. 348, 352, 31 A.2d 52, 55 (1943). There we held that in order to qualify as a charitable institution, an obligation must exist to perform the organization's stated purpose to the public, rather than simply to the members of the organization. Consequently, a stated purpose in the plaintiff's charter to "maintain in the public mind the patriotic spirit of those who led the forces which won our country's independence," without a dedication of property to which such public service might be carried out, was insufficient to establish that the service was anything more than that which the plaintiff "might at its option and in its uncontrolled discretion see fit to furnish." *Id.* at 352–53, 31 A.2d at 55.

"Obligation" was again referred to by this court in *Nature Conservancy v. Nelson*, 107 N.H. 316, 317, 221 A.2d 776, 777 (1966). We stated that

"the public service which plaintiff is to render must be obligatory so as to enable the Attorney General or other public officer to enforce this right against it if the service is not performed. It follows that if the public benefit is limited to that which the plaintiff sees fit to provide at its option or in its uncontrolled discretion the requirements of RSA 72:23 V are not satisfied."

*Id.* at 319, 221 A.2d at 779 (citations omitted). The Nature Conservancy's property was dedicated to the conservation of natural resources and the promotion of education in the fields of ecology, natural history and nature conservation, with no pecuniary profit to its members and no restrictions confining benefits to them. As such, we held that "[t]hese objects by their nature tend to promote the general welfare" and thus established plaintiff's status as a charity. *Id.* at 320, 221 A.2d at 779. The plaintiff was, however, denied a tax exemption because its property was not sufficiently occupied and used by it for its public charitable purposes.

As these cases indicate, the purpose of the "obligation" requirement is to prevent purely private organizations, albeit with charitable purposes, from benefitting by a tax exemption without, in turn, providing some service of public good. We think, therefore, that the city's construction of the term "obligation" is too narrow. "An exemption of charitable institutions from taxation being granted, a prescribed condition that only such as meet a hard and fast definition does not accompany it. 'The legislative purpose to encourage charitable institutions is not to be thwarted by a strained, over-technical, and unnecessary construction.'" *Young Women's Christian Ass'n v. Portsmouth*, 89 N.H. 40, 42, 192 A. 617, 618 (1937) (quoting *Carter v. Whitcomb*, 74 N.H. 482, 487, 69 A. 779, 783 (1908)). While we disagree with the home's position that homes for the aged are *per se* charitable organizations for purposes of tax exempt status, *see* RSA 292:1, III (1987), we hold that the home has adequately established that it is a charitable entity.

■ Since its incorporation, the home has undertaken, consistent with the language of its charter, the sole purpose "of assisting and aiding worthy aged people." The home has thereby sufficiently evidenced that it is "obligated, by its charter *or otherwise*," RSA 72:23-*l* (emphasis added), to provide low cost care for the elderly. As the board stated in its order, "[t]he Taxpayer provides a record, consistent and unblemished of more than fifty years, of exemplary, quality charitable health care and residential maintenance to Franklin residents and surrounding area clients at below cost rates and lower than area Medicaid and Medicare facilities can offer." Certainly, the service the home provides is within the class which the legislature intended to favor and encourage. *See Carter v. Whitcomb*, 74 N.H. at 488–89, 69 A. at 783–84. Accordingly, we affirm the board's ruling that the home is entitled to an exemption pursuant to RSA 72:23.

*Affirmed.*

All concurred.