Merrimack
No. 2005-706

ELDERTRUST OF FLORIDA, INC.

v.

TOWN OF EPSOM

Argued: October 11, 2006
Opinion Issued: January 18, 2007

694

*Orr & Reno, P.A.,* of Concord (*William L. Chapman* and *Jessica E. Storey* on the brief, and *Mr. Chapman* orally), for the plaintiff.

*Soltani/Mosca, PLLC*, of Epsom (*Edward C. Mosca* on the brief and orally), for the defendant.

DUGGAN, J. The defendant, Town of Epsom (Town), appeals a recommendation of the Special Master (*Manias*, J.), approved by the Superior Court (*Fitzgerald*, J.), granting a charitable tax exemption on properties owned by the plaintiff, ElderTrust of Florida, Inc. (ElderTrust). We affirm.

*I. Background*

The trial court found the following facts. National Health Investors (NHI) is a real estate investment trust that held mortgages on Epsom Manor and Heartland Place (collectively, the facilities), both of which are located in Epsom. Epsom Manor is a skilled nursing facility and Heartland Place is an assisted living facility. In 1999, NHI foreclosed on the mortgages for both facilities, took over their operation, and later contracted with National HealthCare Corporation (NHC) to manage them.

ElderTrust is a Tennessee non-profit corporation. Pursuant to its articles of incorporation, ElderTrust was "organized, and at all times thereafter operated, exclusively for public charitable uses and purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code, to establish, acquire, own, maintain, and operate hospitals, nursing homes and related health care facilities, including retirement housing for elderly persons."

In 2001, CFN Manchester/North, LLC (CFN), a subsidiary of ElderTrust, initiated efforts to acquire the facilities. ElderTrust acted through CFN because it believed that such an operational arrangement would facilitate its efforts to obtain funding from the United States Department of Housing and Urban Development (HUD) to finance the acquisition. However, HUD denied CFN's application for financing in 2001, so ElderTrust purchased the facilities through a mortgage financed by NHI, and contracted with NHC to manage the facilities for a fixed fee.

Thereafter, ElderTrust sought a tax exemption on the facilities under RSA 72:23, V for the 2002 tax year. The Town denied ElderTrust's application and assessed a tax totaling $104,774.90 on both facilities, which ElderTrust paid. ElderTrust appealed to the superior court, which ruled that the tax exemption should have been granted. The Town then appealed to this court.

Here, the Town argues the trial court erred in granting the tax exemption and in concluding that ElderTrust: (1) was established and administered for the purpose of performing some service of public good or welfare; (2) provided no pecuniary profit or benefit to its officers or

members; and (3) owned, used or occupied its property for charitable purposes.

## II. Standard of Review

Resolution of this appeal requires us to consider the interpretation and application of RSA 72:23, V (2003) and RSA 72:23-*l* (2003). *See E. Coast Conf. of the Evangelical Covenant Church of America v. Town of Swanzey*, 146 N.H. 658, 661 (2001). The interpretation and application of statutes present questions of law, which we review *de novo. See, e.g., Town of Hinsdale v. Town of Chesterfield*, 153 N.H. 70, 72 (2005); *see also Hattiesburg Area Senior Servs., Inc. v. Lamar County*, 633 So. 2d 440, 444 (Miss. 1994) (*de novo* review of charitable tax exemption cases); *Iowa Methodist Hosp. v. Bd. of Review*, 252 N.W.2d 390, 391 (Iowa 1977) (*de novo* review of charitable tax exemption cases). In conducting our review, we accord deference to the trial court's findings of historical fact, where those findings are supported by evidence in the record. *Elwood v. Bolte*, 119 N.H. 508, 510 (1979).

## III. Discussion

The Town contends, in essence, that the trial court misinterpreted and misapplied RSA 72:23, V and RSA 72:23-*l*. We first interpret the statutes, and then consider their application.

RSA 72:23, V provides an exemption from taxation for:

> [t]he buildings, lands and personal property of charitable organizations and societies organized, incorporated, or legally doing business in this state, owned, used and occupied by them directly for the purposes for which they are established, provided that none of the income or profits thereof is used for any other purpose than the purpose for which they are established.

Pursuant to RSA 72:23-*l*,

> [t]he term "charitable" as used to describe a corporation, society or other organization within the scope of this chapter, including RSA 72:23 and 72:23-k, shall mean a corporation, society or organization established and administered for the purpose of performing, and obligated, by its charter or otherwise, to perform some service of public good or welfare advancing the spiritual, physical, intellectual, social or economic well-being of the general public or a substantial and indefinite segment of the general public that includes residents of the state of New Hampshire, with no pecuniary profit or benefit to its officers or

members, or any restrictions which confine its benefits or services to such officers or members, or those of any related organization. The fact that an organization's activities are not conducted for profit shall not *in itself* be sufficient to render the organization "charitable" for purposes of this chapter, nor shall the organization's treatment under the United States Internal Revenue Code of 1986, as amended. This section is not intended to abrogate the meaning of "charitable" under the common law of New Hampshire.

RSA 72:23-*l* (emphasis added); *see also The Housing Partnership v. Town of Rollinsford*, 141 N.H. 239, 241 (1996) (RSA 72:23-*l* "is consistent with the common law definition of charitable organization.").

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Town of Hinsdale*, 153 N.H. at 72. When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Appeal of Town of Bethlehem*, 154 N.H. 314, 319 (2006). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.*

We have interpreted and applied both RSA 72:23, V and RSA 72:23-*l* on a number of previous occasions. *See, e.g., Appeal of Town of Wolfeboro*, 152 N.H. 455, 458-59 (2005); *Appeal of City of Franklin*, 137 N.H. 622, 624-25 (1993); *Town of Rollinsford*, 141 N.H. at 240-41; *Town of Swanzey*, 146 N.H. at 661-62. In most of our past cases, we have conducted a narrow analysis to ascertain whether a particular portion of the charitable tax exemption statutory scheme was satisfied. We have not yet been presented with an opportunity to synthesize our previous holdings and to delineate a clear, multipartite inquiry, grounded in the statutory language, as to when a charitable tax exemption should be granted under RSA 72:23, V and RSA 72:23-*l*. We now take the opportunity to join a number of other courts, *see, e.g., Methodist Old Peoples Home v. Korzen*, 233 N.E.2d 537, 541-42 (Ill. 1968); *Clark v. Marian Park, Inc.*, 400 N.E.2d 661, 664 (Ill. App. Ct. 1980); *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306, 1317 (Pa. 1985), in articulating a discrete set of factors against which a charitable tax exemption application must be evaluated.

■ We hold that the plain language of RSA 72:23, V and RSA 72:23-*l* requires the institution to satisfy each of the following four factors; namely, whether: (1) the institution or organization was established and is administered for a charitable purpose; (2) an obligation exists to perform the organization's stated purpose to the public rather than simply to

members of the organization; (3) the land, in addition to being owned by the organization, is occupied by it and used directly for the stated charitable purposes; and (4) any of the organization's income or profits are used for any purpose other than the purpose for which the organization was established. Under the fourth factor, the organization's officers or members may not derive any pecuniary profit or benefit. *See* RSA 72:23, V; RSA 72:23-*l*. Although these four factors are anchored in the plain language of the statutes, they also have firm moorings in our case law. *See, e.g., Town of Rollinsford*, 141 N.H. at 241-42; *Society of Cincinnati v. Town of Exeter*, 92 N.H. 348, 352 (1943).

While not in the precise form we articulated above, the record demonstrates that the trial court gave consideration to each of these four factors. Accordingly, we turn to the Town's argument that the trial court misapplied the statutory charitable tax exemption scheme, keeping in mind that "[t]he burden of demonstrating the applicability of any exemption [is] upon the claimant." RSA 72:23-m (2003).

As to the first factor, the Town advances essentially two contentions. First, it contends that the wording of ElderTrust's articles of incorporation is not sufficiently indicative of a charitable purpose. The trial court ruled that ElderTrust's "articles of incorporation demonstrate that it was established ... to perform a service of public good, namely providing skilled nursing and assisted living facilities for the elderly." We agree with the trial court. The language of ElderTrust's articles of incorporation required it to be "operated, exclusively for public charitable uses and purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code, to establish, acquire, own, maintain, and operate hospitals, nursing homes, and related health care facilities, including retirement housing for elderly persons."

Second, the Town contends that the types of housing referenced in ElderTrust's articles of incorporation do not assist "worthy aged people" and therefore ElderTrust was not established for a charitable purpose. On at least three occasions, we have discussed whether particular housing arrangements for the elderly fulfill the charitable purpose requirement of the statute. *See Town of Wolfeboro*, 152 N.H. at 459-62 (discussing charitable tax exemptions for elderly housing). Consistent with other jurisdictions, we have held that under our State's statutory scheme, a provider of elderly housing must do more than simply offer rental units in order to be eligible for a charitable tax exemption on a given parcel of property. *See id.; see also City of Franklin*, 137 N.H. at 626 (homes for the aged are not *per se* tax exempt organizations); *Riverview Place, Inc. v. Cass County*, 448 N.W.2d 635, 642 (N.D. 1989) (charitable tax exemption

"requires something more than merely providing an aggregate-living facility for the elderly in order to qualify as a charitable use of property"); 71 AM. JUR. 2D *State and Local Taxation* §§ 327, 328, at 623-26 (2001).

■ Here, with the possible exception of basic retirement housing, *see Town of Wolfeboro*, 152 N.H. at 459-62, ElderTrust's articles of incorporation describe facilities that provide a level of care or services above that of mere apartment or rental units. To the extent the Town argues that a particular facility is not used directly for a charitable purpose, we address that argument under our analysis of the third factor. Thus, under the current statutory scheme, we uphold the trial court's conclusion that ElderTrust was established for a stated charitable purpose.

■ In terms of the second factor, we have held that

> the public service which [the applicant] is to render must be obligatory so as to enable the Attorney General or other public officer to enforce this right against it if the service is not performed. It follows that if the public benefit is limited to that which the plaintiff sees fit to provide at its option or in its uncontrolled discretion the requirements of RSA 72:23 V are not satisfied.

*City of Franklin*, 137 N.H. at 625 (quotation omitted). The purpose of the obligation requirement is to prevent organizations, even if they operate for charitable purposes, from obtaining the benefits of a tax exemption without providing some service of public good. *Id.* at 626.

In challenging the trial court's conclusions on the second factor, the Town preliminarily argues that "[t]he trial court did not specify what portion of the articles of incorporation it had in mind" in holding that ElderTrust was under an enforceable obligation to perform a service of public good or welfare. However, on the first page of its order, the trial court quoted the portion of ElderTrust's articles of incorporation cited above upon which it relied in reaching its decision.

The Town's substantive argument regarding the second factor is that ElderTrust did not operate under an enforceable obligation to fulfill a charitable purpose. In reaching its conclusion that an enforceable obligation to operate with a charitable purpose did exist, the trial court examined ElderTrust's articles of incorporation, among other documents or evidence. Examining such documents is consistent with our approach to the obligation inquiry in previous charitable tax exemption cases. *See, e.g., Nature Conservancy v. Nelson,* 107 N.H. 316, 319-20 (1966). The language of a particular organization's articles of incorporation, at least to some

extent, may alleviate a concern that an organization would provide no more services than what it "might at its option and in its uncontrolled discretion see fit to furnish." *City of Franklin*, 137 N.H. at 625 (quotation omitted).

■ By the express language of its articles of incorporation, ElderTrust was required to be "operated[] *exclusively* for public charitable uses and purposes." (Emphasis added.) In context, the use of the word "exclusively" places a significant and enforceable limitation on ElderTrust's operation. Moreover, although the Town contends that enforcement of a charitable purpose is compromised by the fact that ElderTrust's articles of incorporation do not expressly reference elderly persons with "low and moderate income," the Massachusetts Supreme Judicial Court has reasoned that "[a]n organization does not necessarily have to serve the poor or the needy in order to qualify for the charitable exemption." *Western Mass. Lifecare v. Bd. of Assessors*, 747 N.E.2d 97, 104 (Mass. 2001) (holding that elderly living facility did not qualify for exemption because its admissions process depended upon financial status of applicants); *accord Eden Retirement Center, Inc. v. Dep't of Revenue*, 821 N.E.2d 240, 251 (Ill. 2004) ("[C]harging fees and dispensing benefits to other than those who are poverty stricken does not cause an institution to lose its charitable character." (quotation omitted)). We find this reasoning persuasive and thus reject the Town's argument that ElderTrust's articles of incorporation could not create an enforceable charitable obligation unless they specified a particular income level for residents of or applicants to the facilities. In short, ElderTrust's articles of incorporation sufficiently circumscribe its discretion and define an enforceable charitable obligation even without an express reference to persons of "low and moderate income." We note, however, that the actual provision of services to such persons may be an important consideration in analyzing how an entity carries out its obligation under the third factor of our analysis. Accordingly, we hold that ElderTrust's articles of incorporation sufficiently define a charitable purpose such that the purpose could be enforced. ElderTrust is not left with an impermissible level of discretion. *See Town of Rollinsford*, 141 N.H. at 241.

In terms of the third factor, we have held that in order "[t]o qualify for an exemption, the land, in addition to being owned by the association, would have to be occupied by the association and used directly by the association for its charitable purposes." *Id.* at 242 (quotation and brackets omitted). An analysis of the third factor may overlap with that of the first because these two factors are interdependent—that is, the third factor primarily asks whether the charitable purpose identified under the first factor is being carried out on the particular parcel of property for which

the exemption is being sought. By inquiring beyond simply who owns a particular parcel, the third factor accounts for charitable institutions that do not necessarily use all of their properties to directly advance a charitable mission. *Riverview Place*, 448 N.W.2d at 640 ("The ownership of the property in question by an institution of public charity does not, by that fact alone, exempt the property from taxation."); *see also Appalachian Mountain Club v. Meredith*, 103 N.H. 5, 9-10 (1960).

In order for a residence to satisfy the third prong, the occupancy of the property must be reasonably necessary for the charitable organization to carry out its mission. *Town of Rollinsford*, 141 N.H. at 242. When the use is slight, negligible or insignificant, or not in the performance of the public purpose, the applicant is not entitled to a tax exemption. *Id.* A determination of whether an organization performs a charitable purpose depends upon the particular facts of the case. *See* 84 C.J.S. *Taxation* § 323, at 391-92 (2001) ("[E]ach case must be decided on its own peculiar, or particular, facts or circumstances, and an organization or institution, in order to have its property exempt, must come, and stay, within the bounds prescribed by the constitution or statute.").

Here, the record supports the trial court's conclusion that Epsom Manor, as a skilled nursing facility, and Heartland Place, as an assisted living facility, provided more services than would be provided at a mere aggregate living facility and were occupied and used directly to advance ElderTrust's charitable purpose. For example, Epsom Manor provided nursing and other care to its occupants as part and parcel of their residency there. We have been directed to no evidence that Epsom Manor residents were required to pay extra fees in order to obtain certain of these services. With respect to Heartland Place, we have previously distinguished between assisted living facilities and independent living facilities, with the former generally providing more services to its residents. *See Town of Wolfeboro*, 152 N.H. at 457. This distinction applies here insofar as the residents of Heartland Place were, as found by the trial court, entitled to 24-hour nursing care, housekeeping and administration of medicine, among other services.

The Town argues that since these services were not provided for free, Heartland Place and Epsom Manor were not owned, used, or occupied directly for a charitable purpose. We have held that charging fees to residents of elderly housing does not alone preclude an organization from obtaining a charitable tax exemption, as long as the fees "directly fulfill the organization's charitable purpose, or are necessary for the organization to accomplish its purpose." *Senior Citizens Housing Dev.*

*Corp. v. City of Claremont,* 122 N.H. 1104, 1108 (1982); *see also Appeal of City of Laconia,* 146 N.H. 725, 728-29 (2001); 71 AM. JUR. 2D *State and Local Taxation* § 308 (2001). Here, the fees charged to live in Epsom Manor and Heartland Place are reasonably necessary for ElderTrust to carry out its mission of providing hospitals, nursing homes, and related health care facilities and services for the elderly in southern New Hampshire. *See Town of Rollinsford,* 141 N.H. at 243 ("[T]he specially adapted nature of elderly . . . housing . . . is often modified to accommodate the needs of the residents and the occupancy of such housing is necessary in order for elderly and disabled tenants to receive the special benefits this housing provides." (citations omitted)). Considering that both facilities operated at a financial loss, it is not surprising that we have been directed to no evidence that the charged fees were equal to, or exceeded, the value or cost of the benefits provided.

The Town also takes issue with the facilities' policies on the fees collected. The Town correctly notes that a number of patients were "private pays" and that ElderTrust required would-be residents to sign an admission agreement that permitted ElderTrust to discharge a patient for failure to pay. The Town argues that these two facts undermine the extent to which ElderTrust operated the facilities directly for its charitable purpose. However, at the hearing before the trial court, there was testimony that: (1) a patient's ability to pay was not a prerequisite for admission; (2) Epsom Manor and Heartland Place operated at a financial loss; (3) patients were accepted in some cases before ElderTrust knew whether the patient would receive Medicaid; and (4) representatives of ElderTrust negotiated with patients in financial difficulty in order to find a lower rate at which the patient could afford to make payments. Indeed, some residents remained at the facility for ten months without paying. *Cf. Brattleboro Retreat v. Town of Brattleboro,* 173 A. 209, 212-13 (Vt. 1934) (declaring facility eligible for tax exemption, despite the fact that there was no written policy of accepting patients for charity, in part because the facility supported a large number of patients even if the patient suffered from an inability to pay as promised). Moreover, when a patient's Medicare coverage or other sources of funds ran out, both facilities permitted the resident to retain the same room, even if that room had a market value higher than the resident could afford to pay. *See* 71 AM. JUR. 2D *State and Local Taxation* § 308, at 596 (2001) ("Where everyone must pay the same rate regardless of one's ability to pay, that is evidence that the organization is not operating as a charity."). Permitting an individual to remain in a particular bed, even if that individual cannot pay the cost of services rendered, makes it less likely that he or she will become a burden

on governmental coffers. Thus, although ElderTrust does require a resident to sign the admissions agreement, the evidence of its actual practices shows that it allowed people to remain at the facilities despite an inability to pay. ElderTrust's actual practices are crucial to our conclusion concerning whether the facilities are occupied and used directly for a stated charitable purpose.

In addition, other evidence tends to demonstrate that the provision of services was charitable in nature, including evidence that a number of patients or residents paid substantially below the advertised rate for the accommodations and services they received at the facilities. For example, at Heartland Place, some residents paid $25 on rooms valued at $60. There was also testimony that a number of Medicaid patients, whose monthly payments were also substantially below the published rate, were accepted. In fact, some 70% of the days billed at Epsom Manor were at Medicaid rates, and the trial court found that Medicaid payments did not cover the entire cost of the services provided. Accordingly, it follows that the facilities provided care and services, which cost more than the fees charged, to a portion of the population who otherwise would have imposed a burden upon the government. The record also reflects that ElderTrust used profits generated at other of its facilities in order to keep Epsom Manor and Heartland Place in operation and to advance its charitable mission. Thus, we hold that ElderTrust operated both facilities directly for a charitable purpose within the meaning of the statute.

Finally we turn to the fourth factor. Under this factor, it must be determined whether the organization's income or profits are used for any purpose other than the purpose for which the organization was established. RSA 72:23, V. We also consider, as part of this inquiry, whether ElderTrust offers a "pecuniary profit or benefit to its officers or members, or any restrictions which confine its benefits or services to such officers or members, or those of any related organization." RSA 72:23-*l*; *see also Town of Exeter*, 92 N.H. at 352.

The Town argues that since ElderTrust pays a substantial amount of its earnings to NHC and NHI, two for-profit entities, and since two members of ElderTrust's board hold stock in NHC and/or NHI, ElderTrust is both: (1) using its income or profits for purposes other than that for which it was established; and (2) offering pecuniary profit or benefit to some of its members and related organizations.

The trial court found that "[t]here is no evidence to suggest that [ElderTrust] is so intertwined with the affairs of either NHC or NHI such that [it] is run for the benefit of either for-profit corporation." The Town contends that this finding indicates that the trial court violated RSA 72:23-

m by impermissibly shifting the burden of proof from the applicant to the Town to offer evidence on this prong of the charitable tax exemption inquiry. The Town misreads the trial court's order. Reading this finding in the context of the trial court's whole order, we conclude that the trial court did not shift the burden to the Town. Instead, the trial court simply noted that, upon review of the many financial and related documents in the record, it did not find evidence of a use of income or profits that would contravene the statute. We refuse to consider phrases from the trial court's order out of context.

The trial court also found that: (1) "NHC was chosen to manage the facilities because, after completing due diligence, [ElderTrust] found that NHC had substantial experience running charitable healthcare facilities and had submitted the best bid for operating the facilities"; (2) ElderTrust's "choice to contract with NHC for the management of the property does not evidence any intent to use [ElderTrust] purely as a means to benefit NHC"; (3) ElderTrust's purchase of the facilities "from NHI was not structured in such a way as to demonstrate that [ElderTrust] intended to benefit NHI" especially in light of the interest rate it offered to ElderTrust; and (4) "[t]he mortgage with NHI and the contract with NHC are the products of arm's length negotiations and do not establish that [ElderTrust] exists for the benefit of NHI or NHC." We also note that: (1) ElderTrust's articles of incorporation contain provisions prohibiting distributions of net earnings and other profits to officers, directors, or other private citizens; and (2) one of the overlapping shareholders left the room on at least some occasions when the NHC contract or NHI mortgage were discussed. These findings support the trial court's conclusion that ElderTrust was not using its profits for purposes other than that for which it was established.

The Town argues that the evidence in the record is not sufficient to support some of these findings. On appeal, we review sufficiency of the evidence claims as a matter of law, and uphold the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law. *Fichtner v. Pittsley*, 146 N.H. 512, 515 (2001). We accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony. *Id.*

The Town first argues that there was no evidence that ElderTrust acted "to solicit competitive bids" for the services provided by NHC and, therefore, ElderTrust was improperly using its funds to make NHC more profitable. However, the minutes from a meeting of ElderTrust's board of directors indicate that the chairman discussed with the board "his efforts to obtain management contract and working capital proposals from 4 different operators including Life Care Centers of America, Beverly

Enterprises, Inc., HCR ManorCare and [NHC]." The chairman also spoke by telephone with officials from at least two of these companies, and attempted to speak with a third, to discuss the submission of a bid to manage the ElderTrust facilities. NHC was selected after these efforts. ElderTrust's board based its selection of NHC upon a number of factors, including: (1) NHC had managed both facilities before ElderTrust took over ownership, so it was familiar with the facilities in a way that other management companies arguably might not have been; and (2) NHC had offered terms which were more favorable financially than those contained in the proposal submitted by Beverly Enterprises. Ultimately, NHC was paid fixed fees of $20,000 per month to manage Epsom Manor and $4,000 per month to manage Heartland Place.

With respect to ElderTrust's mortgage from NHI, the Town contends that "there is no evidentiary support for the trial court's finding that the mortgage [rate offered to ElderTrust] was 'at below market rates.'" The trial court heard testimony, which it credited, that ElderTrust received a 6.9% rate on its mortgage with NHI, reduced from 10.8%. At trial, NHI's senior vice president for finance described this interest rate as "way below the market[,]" and the court credited this testimony as well.

The Town also contends that there is no evidence of any negotiation between ElderTrust and NHI. However, the trial court received testimony that ElderTrust was able to negotiate a deal whereby "in lieu of payments to [NHI], . . . [ElderTrust] [would] pay monies into a capital improvements account" that would be used solely to advance the company's charitable mission. Further, ElderTrust had negotiated with NHI that the total amount of the mortgage would be the lesser of either the HUD valuation or the pre-existing NHI investment in the properties. (As stated above, NHI held the mortgage on the property under the prior owner.) These terms were more favorable than those contained in any of the fifty to seventy mortgages that NHI had granted to other health care facilities. Accordingly, based upon our review of the record, we hold that the trial court's findings concerning whether ElderTrust was using its income or profits for purposes other than that for which it was established are supported by the evidence.

As to whether ElderTrust operated to provide pecuniary profit or benefit to its officers or members, *see* RSA 72:23-*l*, the record demonstrates that William Richmond, the president of ElderTrust and chairman of its board, owned 14,000 to 15,000 shares of stock in NHI and 8,000 to 10,000 shares of stock in NHC. Michael Neal, a member of ElderTrust's board and a senior regional vice president of NHC, also held stock in NHC. There is no evidence in the record that any other members

of ElderTrust's board had any financial interest in NHI or NHC. Further, Richmond testified that no member of ElderTrust's board served as a board member of NHI or NHC. An individual who held the title of senior vice president of finance for both NHI and NHC presented both companies' proposals to the ElderTrust board; however, he never served as a director of ElderTrust. Thus, the question is whether the interests of Richmond and Neal are sufficient to deprive ElderTrust of the benefit of a tax exemption.

In responding to this query, we make two preliminary observations: (1) ElderTrust is one client of these two companies, and as such, it pays each company for services rendered; and (2) the Town has not pointed to any legal authority indicating a bright-line rule that tax exempt charitable organizations may never enter into agreements with for-profit entities that happen to have links or connections with members of the charitable organization's board. See 26 U.S.C. § 503(b)(6) (2000) (limiting but not precluding transactions involving charitable organizations and other entities with overlapping interests).

We harbor some concern about the overlapping interests of the participants to the transactions at issue. See id. However, based upon the record in this case, we are unable to conclude that the statutory scheme has been violated. For example, the Town does not point to, nor do we find, any portion of the record indicating that Epsom Manor or Heartland Place generated profits for excessive salaries to ElderTrust's members or that the financial losses at either facility were markedly improving such that a net generation of revenue was likely. No director of ElderTrust received more than $750 for his services (to ElderTrust) in 2002. Cf. Couriers-Susquehanna, Inc. v. County of Dauphin, 645 A.2d 290, 294 (Pa. Commw. Ct. 1994) (describing large salaries for directors where there was no evidence of actual work performed or time spent at the institution); 26 U.S.C. § 503(b)(6) (requiring the individual or entity holding the overlapping interests to own a particular percentage of shares or interests before transaction is prohibited).

In addition, the Town has not pointed to any evidence clearly indicating that the value of Richmond's or Neal's stock necessarily or automatically increased due to the transactions with ElderTrust particularly. Indeed, although Richmond testified on cross-examination that the value of his stock would improve to the extent that NHI was profitable, such a profit was speculative and not clearly linked to the relationship with ElderTrust in particular. Nor has the Town pointed to any evidence clearly indicating that Neal's salary as regional vice-president of NHC increased as a result of ElderTrust's management

contract with that company. Furthermore, we have upheld the trial court's findings concerning the relationship between the three organizations and the formation thereof. Accordingly, under these circumstances, we conclude that the record supports the trial court's findings and rulings concerning whether ElderTrust operated to provide pecuniary profit or benefit to its officers or members.

*IV. Conclusion*

In sum, we uphold the trial court's determination that ElderTrust met its burden with respect to each of the four factors. *See* RSA 72:23-m. However, we regard this as a particularly close case, especially with respect to the second and fourth factors. While we are bound to apply the statute as written, *Whitcomb v. Town of Carroll*, 141 N.H. 402, 412 (1996), the legislature is of course free to amend the statutory scheme, should it disagree with the result we reach today. *See In the Matter of Fulton & Fulton*, 154 N.H. 264, 268 (2006); *Town of Derry v. Adams*, 121 N.H. 473, 480 (1981).

*Affirmed.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.