NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court-Merrimack Family Division
No. 2022-0011

IN RE J.P.S.; IN RE J.S.

Argued: October 18, 2022
Opinion Issued: February 28, 2023

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Sam M. Gonyea, attorney, on the brief and orally), for the New Hampshire Division for Children, Youth and Families.

Law Office of Chadwick-Fricano-Weber, of Nashua (Joseph C. Fricano on the brief and orally), for the respondent.

HICKS, J. The respondent, Mother, appeals an order of the Circuit Court (Derby, J.) in this child abuse and neglect case brought by the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF). We affirm.

The trial court found the following facts. Mother and Father are the biological parents of J.S. and J.P.S. J.S. was born in 2019. She was born both prematurely and exposed to drugs Mother had taken during pregnancy. Following DCYF intervention, Mother and Father obtained custody of J.S.

J.P.S. was born on October 7, 2021, at Mother and Father's home. Approximately three days after his birth, J.P.S. began showing signs of distress. Father brought J.P.S. to Catholic Medical Center (CMC) under the so-

called "safe haven law," see RSA ch. 132-A (2021), and stated that the child's mother was, or was believed to be, an intravenous drug user.

Because J.P.S's needs were so extensive, he was transported to Boston Children's Hospital (BCH). After three days at BCH, J.P.S. returned to CMC, where he was still being treated at the time of the adjudicatory hearing. He was diagnosed with neonatal abstinence syndrome (NAS), also known as drug withdrawal, and was treated with morphine and clonidine.

On or about October 14, 2021, DCYF filed six abuse and neglect petitions. After the court dismissed two abuse petitions, DCYF filed two more, resulting in the following charges and adjudications. The court entered findings of "true" with respect to four petitions alleging neglect of J.S. and J.P.S. by Mother and Father. The two remaining petitions alleged abuse of J.P.S. by Father and Mother, respectively, through injuries sustained by J.P.S. after birth, caused by Mother's prenatal narcotics use. The court entered findings of "not true" with respect to Father and "true" with respect to Mother.

Mother appealed, challenging the finding of abuse of J.P.S. and the findings of neglect of both J.P.S. and J.S., and raising other alleged errors. The only question briefed by Mother, however, relates to the finding of abuse of J.P.S. Accordingly, we deem all other issues raised in Mother's notice of appeal waived. See In re M.M., 174 N.H. 281, 298 (2021) ("All issues raised in . . . [the] notice of appeal, but not briefed, are deemed waived.").

We will uphold the findings and rulings of the trial court unless they are unsupported by the evidence or are legally erroneous. See In re Craig T., 144 N.H. 584, 585 (1999). "The court, which is the trier of fact, is in the best position to assess and weigh the evidence before it because it has the benefit of observing the parties and their witnesses." Id. (quotation omitted). "Consequently, our task is not to determine whether we would have found differently; rather, we determine whether a reasonable person could have found as the trial judge did." Id. (quotation omitted). "We review the [trial] court's statutory interpretation de novo." In re D.O., 173 N.H. 48, 52 (2020).

As Mother frames it, the issue on appeal is: "Whether the trial court erred by including a viable fetus within the statutory definition of a child under RSA 169-C:3(V) (2022)." Under that statute, the term "[c]hild means any person who has not reached his eighteenth birthday." RSA 169-C:3, V (quotation omitted). Mother argues that this definition is unambiguous and "does not include either an 'unborn child' or a 'fetus' within the meaning of 'child.'" Mother also notes that RSA 169-C:3, II, "which defines an abused child, does not include a reference to an unborn child or fetus," see RSA 169-C:3, II (2022), and that the legislature did "not include the word 'fetus' in the entire statutory scheme of RSA [chapter] 169-C," see RSA ch. 169-C (2022 &

2

Supp. 2022). Finally, citing RSA 630:1-a, V(b)(1) (Supp. 2022), she argues that when the legislature "intends to include a fetus in child abuse statutes, it has done so specifically." We note, however, that the statute Mother cites is not explicitly a "child abuse" statute, but rather, is part of the Criminal Code.

We need not reach this issue. DCYF argues and we agree that "J.P.S. satisfied the plain language of RSA 169-C:3, II(d)" at the time the abuse petition was filed. Thus, we agree with DCYF that we need not decide whether a fetus is a "child" under RSA 169-C:3, V. Accordingly, we now address the issue as framed by DCYF: whether "a finding of abuse pursuant to RSA 169-C:3, II(d) can be sustained based upon a mother's prenatal substance abuse that manifests in physical injuries to the child after birth." Cf. In re Baby Boy Blackshear, 736 N.E.2d 462, 464 (Ohio 2000) (disagreeing with mother's framing of issue and finding that "the issue is not whether a fetus is a child but rather whether the plain language of [the child abuse statute] applies to Lorenzo and the facts of this case").

Answering the question posed requires us to engage in statutory interpretation, "which presents a question of law subject to de novo review." In re J.S., 174 N.H. 375, 379 (2021) (quotation omitted). "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Id. (quotation omitted). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. (quotation omitted). "Absent an ambiguity, we need not look beyond the language of the statute to discern legislative intent." Id. (quotation omitted).

RSA 169-C:3 provides, in relevant part, that "[a]bused child means any child who has been . . . [p]hysically injured by other than accidental means." RSA 169-C:3, II (2022) (quotation omitted). DCYF argues that "[t]he statute includes no language requiring the injurious conduct and resulting injury to exist concurrently." We agree. We find the Tennessee Court of Appeals' decision in In re Benjamin M., 310 S.W.3d 844 (Tenn. Ct. App. 2009), instructive. There, the court noted that "abuse" was statutorily "defined to include a child who 'is suffering from, has sustained, or may be in immediate danger of . . . sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent.'" In re Benjamin M., 310 S.W.3d at 848 (quoting Tenn. Code Ann. § 37–1–102(b)(1) (2005)). Similarly, the statutory definition of "severe child abuse" referred to abuse or neglect "'that is likely to cause great bodily harm or death'" or "'that in the opinion of qualified experts has caused or will reasonably be expected to produce'" certain severe adverse outcomes. Id. (quoting Tenn. Code Ann. § 37–1–102(21) (2005) (renumbered (23) in 2009 Supp.). The court concluded, "Obviously, the wording we have emphasized

3

shows that a finding of abuse can be based on conduct that occurs at one time and injury that occurs at another." Id. Accordingly, the court held that "the statutory language defining severe child abuse clearly reflects an intent that actions before a child is born can constitute abuse to a child that is born injured by those actions. When a child is born alive but injured, the pre-birth timing of the actions is not dispositive." Id. at 850-51.

Although the temporal language in RSA 169-C:3 is not as extensive as in the statutes at issue in In re Benjamin M., we note that the pertinent portion of RSA 169-C:3, II similarly refers to "any child who has been . . . [p]hysically injured." RSA 169-C:3, II (emphasis added). Thus, as was the case in In re Baby Boy Blackshear, "[t]he statute focuses on the status of the child—not the timing of the injury's infliction." In re Baby Boy Blackshear, 736 N.E.2d at 466 (Cook, J., dissenting, but agreeing with majority on this point). The portion of the statute relevant here requires the child to have been "[p]hysically injured by other than accidental means," but is silent about when such non-accidental means must or may occur. RSA 169-C:3, II(d); cf. In re Baby Boy Blackshear, 736 N.E.2d at 466 (Cook, J., dissenting, but agreeing with majority on point cited) (noting that the applicable statute "does not require that the parents inflict injury after birth. It merely requires that the child suffer injury, due to an act by the parents, that harms or threatens to harm the child's health or welfare").

In the instant case, the trial court found:

Dr. Jessica Clem credibly testified to J.P.S.'s condition at the hospitals and interpreted the medical records, which all showed physical injuries to J.P.S. which caused pain, suffering and other problems. The evidence presented also showed that it was and is the result of drug use by [Mother] while pregnant with J.P.S., and the injury was not accidental.

The court also implicitly found that the physical injuries from NAS occurred after J.P.S.'s birth, noting that "it appears that when the withdrawal symptoms manifested, [Father] anonymously brought J.P.S. to CMC for medical care." This is consistent with Dr. Clem's testimony:

Q Okay. So the illness that you're describing here today is something that occurs some point after a child is born if they've been exposed in utero to substances, correct?

A That's correct. Typically, symptoms occur in the first three to five days.

4

Q  Exactly.  And so, to your knowledge, when [J.P.S.] was born and brought to the ER, this was essentially day 3 of his life.  Is that fair to say?

A  That was what was reported, yes.

At that point, J.P.S. clearly met the definition of "child" under 169-C:3, V.  Thus, the trial court concluded: "In sum, J.P.S. is now a child who is suffering non-accidental physical injuries that were caused by [Mother's] actions before delivery."  (Emphases added.)  This conclusion is both supported by the evidence and consistent with the plain language of RSA 169-C:3, II(d).  See In re Craig T., 144 N.H. at 585.  Accordingly, we affirm the trial court's finding of "true" on the petition alleging Mother's abuse of J.P.S.

Finally, Mother raises constitutional concerns about interpreting the statutory definition of "child" to include a fetus.  Specifically, Mother argues that "interpreting RSA 169-C:3(V) to include an unborn fetus would violate a parent's right to due process and fair notice about what conduct would jeopardize their fundamental right to familial integrity."  Because our decision does not rest on the premise that an unborn fetus is a "child" under 169-C:3, V, we need not address this argument.

Statutes reflect policy determinations made by the legislature.  We are bound to apply the statute as written.  See, e.g., ElderTrust of Fla. v. Town of Epsom, 154 N.H. 693, 707 (2007).  The legislature is, of course, free to amend the statutory scheme should it disagree with the result we reach today.  Id.

Affirmed.

MACDONALD, C.J., and BASSETT and DONOVAN, JJ., concurred; HANTZ MARCONI, J., concurred specially.

HANTZ MARCONI, J., concurring specially.  I agree with my colleagues that a child experiencing post-birth injury resulting from a mother's pre-birth actions during pregnancy can satisfy the statutory definition of an "abused child" for the purposes of RSA 169-C:3, II(d).  See RSA 169-C:3, II(d) (2022).  I foresee future cases, however, where the application of this subsection is not so clear.  For the reasons I describe below, the legislature may wish to revisit this statute and clarify the proper application in circumstances where a mother's pre-birth substance misuse causes post-birth injuries to the child.

In particular, I am troubled by the notion that post-birth injury to a child resulting from a mother's substance misuse during pregnancy is, necessarily, "other than accidental."  RSA 169-C:3, II(d) (defining "abused child" to include a child who has been [p]hysically injured by other than accidental means"

5

(emphasis added)).  While substance misuse by a parent is rarely accidental, there are instances where the resulting injury to the child could be considered accidental, such as where the mother is unaware that she is pregnant.  The key words, "by other than accidental means," establish a standard under which courts review the nature of the action that caused the injury.  "Accidental" is defined as "happening by chance, unintentionally, or unexpectedly."  New Oxford American Dictionary 9 (3d ed. 2010).  Therefore, injuries "happening by chance, unintentionally, or unexpectedly," id., would not be the basis for a finding of child abuse under RSA 169-C:3, II(d).  The science of addiction, however, raises concerns that substance misuse is not necessarily a matter of volition, thus making it more difficult to determine whether drug use by the mother and resulting injury to the child should be described as "accidental." See Charles P. O'Brien & A. Thomas McLellan, Myths About the Treatment of Addiction, 347 The Lancet 237, 237 (1996) ("At some point after continued repetition of voluntary drug-taking, the drug 'user' loses the voluntary ability to control its use.  At that point, the 'drug misuser' becomes 'drug addicted' and there is a compulsive, often overwhelming involuntary aspect to continuing drug use and to relapse after a period of abstinence.").  Indeed, the legislature has recognized that substance misuse is a disease that in some instances can warrant a different response by establishing treatment services that acknowledge substance use disorder as a condition, and drug courts that provide community and treatment services to certain high-risk offenders.  See RSA 172:2-a (2022) (establishing a "State Substance Use Disorder Services System" to "provide for the scientific care, treatment, and rehabilitation of individuals with substance use disorders"); RSA 490-G:2 (Supp. 2022) (implementing drug courts to "address appropriately an identified substance abuse problem").  Thus, it may be difficult to properly apply the term "accidental" in this context.

Additionally, using the word "accidental" to delineate a standard of behavior may lead to outcomes which run counter to public policy.  For example, medical experts "recommend treatment with methadone or buprenorphine for pregnant people with [opioid-use disorder]." Treatment for Opioid Use Disorder Before, During, and After Pregnancy, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/pregnancy/opioids/treatment.html (last visited Feb. 16, 2023).  But such treatment can itself cause injury to a newborn.  Id. ("[N]eonatal abstinence syndrome (NAS) is an expected condition that can follow exposure to [medication for opioid-use disorder].").  Therefore, a well-intentioned pregnant mother who exposes her child to addiction medication could fall within a plain reading of the statute, because the resulting injury did not happen "by chance, unintentionally, or unexpectedly." New Oxford American Dictionary 9 (3d ed. 2010) (defining "accidental").  The lack of an exception for a pregnant mother who seeks substance abuse treatment would discourage seeking that help.  Child Protect. and Perm. v. Y.N., 104 A.3d 244, 256 (N.J. 2014) ("[F]inding a mother liable of abuse or

neglect for her newborn's neonatal abstinence syndrome after the mother has made an informed medical decision to undergo methadone maintenance treatment will discourage women from entering detoxification programs that will likely improve their children's health prospects."). Other state legislatures that have enacted laws establishing that a mother's pre-birth drug use can be a basis for an abuse or neglect finding have included exceptions when the drug use was for a medical purpose. See, e.g., Fla. Stat. Ann. § 39.01(34)(g) (West 2021); Ga. Code Ann. § 15-11-2(56) (West 2022); Minn. Stat. Ann. § 260E.03 subdiv. 15(a)(5) (West 2021). RSA 169-C:3, II(d) may not allow for a similar exception.

Finally, the language of the statute may also extend the reach of RSA 169-C:3, II(d) to pre-birth acts beyond substance misuse. There are other arguably non-accidental acts that can cause post-birth injury, such as smoking or driving over the speed limit. To avoid unexpected or undesirable outcomes, the legislature may wish to revisit the phrase "by other than accidental means" in light of the circumstances that may surround a child's post-birth injury caused by pre-birth acts.