NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Carroll
No. 2017-0187


THE MARIST BROTHERS OF NEW HAMPSHIRE

v.

TOWN OF EFFINGHAM

Argued: January 18, 2018
Opinion Issued: September 14, 2018


Pierce Atwood, LLP, of Portsmouth (Jonathan A. Block and Michele E. Kenney on the brief, and Mr. Block orally), for the plaintiff.


Drummond Woodsum & MacMahon, of Manchester (Matthew R. Serge and Demetrio F. Aspiras on the brief, and Mr. Serge orally), for the defendant.


HICKS, J. The plaintiff, The Marist Brothers of New Hampshire (MBNH), appeals the following orders of the Superior Court (Ignatius, J.): (1) a decision, following a two-day bench trial, upholding the denial by the defendant, Town of Effingham (Town), of MBNH's request for a charitable tax exemption, for tax year 2015, for real property, see RSA 72:23, V (2012) (charitable tax exemption), :34-a (Supp. 2017) (appeal from refusal to grant exemption, deferral, or tax credit); and (2) an order granting the Town's motion in limine to exclude evidence of the tax treatment of New Hampshire youth camps other than the camp run by MBNH. We reverse.

The trial court found the following facts, as recited in its written order. MBNH is a New Hampshire non-profit corporation affiliated with The Marist Brothers of the Schools, "an international Catholic teaching Order." As such, MBNH is also affiliated with the Roman Catholic Church. The Marist Brothers of the Schools conducts its operations in the United States through its U.S. Province (U.S. Province). MBNH is tax exempt under section 501(c)(3) of the federal tax code. See 26 U.S.C. § 501(c)(3) (2012).

MBNH was established by U.S. Province "in connection with the acquisition, development and operation of Camp Marist," a religious, residential youth summer camp MBNH founded on 159 acres it acquired in the Town in 1949 (the Property). The Property sits on the shores of Ossipee Lake and "includes camper cabins, offices, a chapel, religious 'mound,' dining hall, and health facility, as well as a number of recreational facilities, including but not limited to, an activity pavilion, archery and rifle ranges, an arts and crafts building, horse stables and athletic fields." Also on the property is a "Log Cabin" or "Retreat Center" that can accommodate more than twenty people and is used "as lodging for Camp staff during the summer camp season and rent[ed] to third parties during the off season." (Quotation omitted.)

MBNH's Articles of Agreement, as amended in 1990, state:

The object for which this Corporation is established is to offer recreational and educational services to persons of whatever race, nationality, ethnic background, state or nation of residence. The corporation recognizes and affirms its traditional affiliation and faith in the Roman Catholic Church. In furtherance of the object, this corporation shall provide opportunities to meet primarily the spiritual, cultural and physical needs of youth.

(Quotation omitted.) In addition, its by-laws state:

The object for which this Corporation is established is to offer religious and educational and charitable services to persons of whatever race, nationality, ethnic background, state or nation of residence. The Corporation recognizes and affirms its traditional affiliation with a faith in the Roman Catholic Church. In furtherance of the object, this corporation shall provide opportunities to meet primarily the spiritual, cultural, and physical needs of youth.

(Quotation omitted.)

Camp Marist is staffed both by Marist Brothers, who receive room and board but no other compensation, and by "paid staff from the United States and around the world." Relatives of staff and of Marist Brothers are allowed to

2

attend Camp Marist "for free without regard to financial need" and "[a]s many as fifty to sixty relatives attend the Camp for free each year."

Camp Marist is co-educational and attracts children from across the United States and the world. In 2015, 490 children attended Camp Marist, thirteen of whom hailed from New Hampshire. Camp Marist operates for seven weeks in the summer, broken down into two two-week sessions and a final three-week session. Campers may attend one or more sessions at a cost ranging, at 2016 rates, from $1,900 for the first two-week session to $5,900 for the full seven weeks. Campers must also pay a non-refundable $175 registration fee, which is not credited against tuition, as well as additional fees to participate in: (1) "many of the activities offered, such as archery, riflery, fishing, and horseback riding"; (2) "all of the academic programs offered . . . [such as] digital photo and media, remedial math, and special tutoring"; and (3) various day trips, such as deep sea fishing, white water rafting, and indoor rock climbing. These additional fees range from $50 to $100 per session in the first two categories and up to $300 per activity in the third.

With respect to scholarships, the trial court found, in part:

> In 2015, the Camp granted 47 full or partial scholarships to campers, totaling $108,739.00. Thus, out of the 490 campers who attended the Camp in 2015, fewer than 10% received scholarships. The vast majority of campers, therefore, pay to attend. Moreover, the Camp is not obligated under its by-laws to provide scholar- ships, and does not advertise the availability of scholarships in its brochure, although scholarship information is available on its website.

(Citations omitted.) In addition, scholarships are available only for the first camp session.

When Camp Marist is not in session, MBNH rents the Property. No restrictions are placed on who is eligible to rent, or how renters use, the Property. Rental proceeds are allocated to either the "regular Camp fund, the running of the Camp, or . . . to some of [MBNH's] scholarships." (Quotation and brackets omitted.)

MBNH's revenues in 2015 totaled $1,363,200, of which $1,239,565 was earned from tuition and fees, and $92,854 from rental of the Property. Total expenses that year were $1,255,313, resulting in net income of $107,907. According to its bylaws, MBNH is required to pay U.S. Province a yearly assessment "to provide support to the religious works and health and well- being of the Marist Brothers." (Quotation omitted.) The assessment was $100,000 in 2013 and has increased by $3,000 each year thereafter. Thus, in 2015, MBNH paid U.S. Province $106,000.

3

MBNH appeals the trial court's affirmance of the Town's denial of a charitable tax exemption. Our standard of review is as follows.

> [W]e uphold the trial court's factual findings and rulings unless they lack evidentiary support or are legally erroneous. We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence. Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. Nevertheless, we review the trial court's application of the law to the facts de novo.

Jesurum v. WBTSCC Ltd. P'ship, 169 N.H. 469, 476 (2016) (quotation and citations omitted). Resolution of this appeal requires us to interpret and apply RSA 72:23, V and RSA 72:23-l (2012), which are questions of law that we review de novo. See ElderTrust of Fla. v. Town of Epsom, 154 N.H. 693, 696 (2007).

> In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. Accordingly, we will overturn the trial court's decision if we find that the court misapprehended or misapplied the law. We note that the legislative purpose to encourage charitable institutions is not to be thwarted by a strained, over-technical and unnecessary construction.

Town of Peterborough v. MacDowell Colony, 157 N.H. 1, 5 (2008) (quotations, citations, and brackets omitted).

We first recite the applicable statutory language. RSA 72:23, V exempts from taxation:

> [t]he buildings, lands and personal property of charitable organizations and societies organized, incorporated, or legally doing business in this state, owned, used and occupied by them directly for the purposes for which they are established, provided that none of the income or profits thereof is used for any other purpose than the purpose for which they are established.

In turn, "[t]he term 'charitable' as used to describe a corporation, society or other organization within the scope of . . . RSA 72:23," is defined in RSA 72:23-l to mean, in relevant part:

4

a corporation, society or organization established and administered for the purpose of performing, and obligated, by its charter or otherwise, to perform some service of public good or welfare advancing the spiritual, physical, intellectual, social or economic well-being of the general public or a substantial and indefinite segment of the general public that includes residents of the state of New Hampshire, with no pecuniary profit or benefit to its officers or members, or any restrictions which confine its benefits or services to such officers or members, or those of any related organization.

In evaluating whether an institution should be granted an exemption under RSA 72:23, V, we apply the four-factor test we articulated in ElderTrust:

[T]he plain language of RSA 72:23, V and RSA 72:23-l requires the institution to satisfy each of the following four factors, namely, whether: (1) the institution or organization was established and is administered for a charitable purpose; (2) an obligation exists to perform the organization's stated purpose to the public rather than simply to members of the organization; (3) the land, in addition to being owned by the organization, is occupied by it and used directly for the stated charitable purposes; and (4) any of the organization's income or profits are used for any purpose other than the purpose for which the organization was established. Under the fourth factor, the organization's officers or members may not derive any pecuniary profit or benefit.

ElderTrust, 154 N.H. at 697-98. The taxpayer bears the burden of establishing entitlement to a charitable tax exemption. See RSA 72:23-m (2012).

MBNH argues that the trial court erred in determining that it met none of the ElderTrust factors. It first challenges the court's determination that it failed to meet the first two ElderTrust factors, which the trial court evaluated together. To satisfy the first two ElderTrust factors, MBNH must demonstrate that it "was established and is administered for a charitable purpose" and that "an obligation exists to perform [its] stated purpose to the public rather than simply to [its] members." ElderTrust, 154 N.H. at 697-98. The trial court determined that MBNH "primarily benefits a limited class of persons, rather than the general public or an indefinite segment thereof."

MBNH asserts that the charitable purposes for which it was established and administered are advancing education and aiding religion. The trial court found "no dispute that MBNH offers religious, educational, and recreational services to its youth campers" and, while not directly ruling on the issue, opined that MBNH's "stated purpose of offering religious, educational, and recreational services to 'persons of whatever race, nationality, ethnic

5

background, state or nation of residence' and the obligation to 'provide opportunities to meet primarily the spiritual, cultural and physical needs of youth' are arguably public charitable purposes."

We confirmed in Granite State Management and Resources v. City of Concord, 165 N.H. 277 (2013), that advancing education and aiding religion are recognized categories of charitable purposes. See Granite State Mgmt. & Res., 165 N.H. at 284; MacDowell Colony, 157 N.H. at 11 (Dalianis, J., concurring specially) (noting that we must look, in addition to the definition of "charitable" in RSA 72:23-l, "to the common law definition of 'charitable,' which is derived from the law of charitable uses and charitable trusts"). Thus, we conclude that MBNH's stated purposes of advancing education and aiding religion are charitable purposes under the first ElderTrust factor. Furthermore, given that the trial court found "no dispute that MBNH offers religious, educational, and recreational services to its youth campers," we conclude, as a matter of law, that the first ElderTrust factor is satisfied.

We now turn to the factor the trial court appears to have found more troubling: whether MBNH is obligated to perform its stated purposes "to the public rather than simply to [its] members." ElderTrust, 154 N.H. at 697-98. "A taxpayer seeking exemption under RSA 72:23, V bears the burden of proving that it is obligated to be a public charity, that is, that the general public, or a substantial portion of it, were the beneficiaries of its uses." E. Coast Conf. of the Evangelical Covenant Church of America v. Town of Swanzey, 146 N.H. 658, 662 (2001) (quotation and brackets omitted). "It cannot be considered a charitable organization if its purposes are confined mostly to benefiting its own members." Id. (quotation omitted).

The trial court concluded:

In light of the Camp's significant tuition and fees and the de minimis amount of scholarships it granted in 2015, the Court finds that MBNH is actually administered so as to benefit a financially limited class of youth, rather than youth in general, the general public, or "a substantial and indefinite segment of the general public that includes residents of the state of New Hampshire."

MBNH contends this conclusion is erroneous because neither the charging of tuition nor the alleged negligibility of its scholarship awards disqualifies it from a charitable tax exemption under RSA 72:23, V. We agree.

With respect to the first point, we observed long ago that "[t]he charge of an admission fee, all of the proceeds of which are used to defray operating expenses, does not alter [an institution's] standing as a charity." Portsmouth Historical Society v. Portsmouth, 89 N.H. 283, 285 (1938) (decided under prior law). More recently, we "recognized that a corporation does not lose its [tax]

6

exempt status . . . merely because it has a net income or makes a profit or charges fees for its services.  The destination of the income, and not the source of the income, determines the exemption." Granite State Mgmt. & Res., 165 N.H. at 292 (quotation omitted); see also ElderTrust, 154 N.H. at 701 (noting that "charging fees to residents of elderly housing does not alone preclude an organization from obtaining a charitable tax exemption, as long as the fees directly fulfill the organization's charitable purpose, or are necessary for the organization to accomplish its purpose" (quotation omitted)).

With respect to the second point, MBNH contends that it cannot be disqualified from obtaining a charitable tax exemption for failing to grant sufficient scholarships because "an organization does not necessarily have to serve the poor or the needy in order to qualify for the charitable exemption." ElderTrust, 154 N.H. at 700 (quotation and brackets omitted).  The Town, on the other hand, asserts that the trial court correctly likened this case to Western Massachusetts Lifecare v. Board of Assessors, 747 N.E.2d 97 (Mass. 2001).

Western Massachusetts Lifecare involved a continuing care retirement community called Reeds Landing.  Western Mass. Lifecare, 747 N.E.2d at 100. The nonprofit corporation operating Reeds Landing appealed the denial of a charitable tax exemption, under Massachusetts law, for the property on which Reeds Landing was located.  Id. at 102.  The Massachusetts Supreme Judicial Court affirmed, noting, in relevant part:

> The benefits of Reeds Landing are limited to those who pass its stringent health and financial requirements, requirements that make most of the elderly population ineligible for admission.  The class of elderly persons who can pay an entrance fee of $100,000 to $300,000 and have, from their remaining assets, monthly income of $2,000 to $7,000 is a limited one, not a class that has been drawn from a large segment of society or all walks of life.

Id. at 104 (quotation omitted).  Here, the Town argues that Camp Marist is like Reeds Landing because "both organizations charge a significant sum for services, which necessarily excludes a large segment of the population from attending."

We do not find Camp Marist's $175 registration fee and tuition rates ranging from $1,900 to $5,900, depending upon the length and time of stay, to be comparable to Reeds Landing's $100,000 to $300,000 entrance fee and $2,000 to $7,000 monthly income requirements.  See id.  Rather, we find this case more analogous to another Massachusetts case, Board of Assessors of Boston v. Garland School of Home Making, 6 N.E.2d 374 (Mass.1937), in which the Supreme Judicial Court ordered an abatement of taxes for an institution claimed by city tax assessors to be "not actually administered for the benefit of

an indefinite class of persons" because "its benefits were limited to the rich and not shared by the poor." Garland School of Home Making, 6 N.E.2d at 382. On that point, the court held:

> The assessors' contention . . . is based on the facts that, so far as appears, none of the persons benefited by the taxpayer paid less than the full charge for tuition, that the charge in the case of each individual was substantial, and that such charges in the aggregate resulted in a profit to the taxpayer from the maintenance of the school. The requirement of the payment of reasonable fees by those who receive the benefits of an institution does not necessarily render it noncharitable. Such a requirement does not necessarily restrict the class of persons benefited so that it is not indefinite. . . . The fact that an educational institution receives without charge, or at reduced rates, students unable to pay full tuition has some tendency to show that it is charitable in nature, but, even if it does not receive students under these conditions, such an institution may be a public charity if the class of persons benefited by it is indefinite. Though the taxpayer's charge for tuition upon each student was substantial in amount it cannot be ruled as [a] matter of law that for this reason the class of persons benefited was so restricted as not to be indefinite within the meaning of the law of public charities. There well might be a large number of persons, many of whom would not ordinarily be regarded as rich, who would wish to avail themselves of the benefits of the taxpayer's institution upon the terms prescribed.

Garland School of Home Making, 6 N.E.2d at 382-83; see also New Habitat v. Tax Collector of Cambridge, 889 N.E.2d 414, 420 (Mass. 2008) (citing Garland School for proposition that "where an organization's purposes and methods [are] traditionally charitable, . . . the organization may charge substantial, reasonable fees for its services").

Here, as in Garland School, "[t]here well might be a large number of persons, many of whom would not ordinarily be regarded as rich," Garland School, 889 N.E.2d at 383, who send their children to Camp Marist notwithstanding the "significant sum for services" it charges. In addition, as in New Habitat, there was no evidence that MBNH's tuition is "unreasonable for the services provided." New Habitat, 889 N.E.2d at 420. Indeed, revenue from tuition and fees alone in 2015 ($1,239,565) would not have covered Camp Marist's expenses for that year ($1,255,313). Cf. ElderTrust, 154 N.H. at 702 ("Considering that both [of the taxpayer's] facilities operated at a financial loss, it is not surprising that we have been directed to no evidence that the charged fees were equal to, or exceeded, the value or cost of the benefits provided."). For the foregoing reasons, we conclude that the trial court's rulings on the

8

second ElderTrust factor "lack evidentiary support" and cannot be upheld. Jesurum, 169 N.H. at 476.

We now consider whether the evidence established as a matter of law that MBNH met the second ElderTrust factor of being "obligat[ed] . . . to perform [its] stated purpose to the public rather than simply to [its] members." ElderTrust, 154 N.H. at 697-98. This factor has two components: whether there is an actual obligation to perform the stated purpose and whether such performance is to the general public or an indefinite segment of it. Cf. MacDowell Colony, 157 N.H. at 13 (Dalianis, J., concurring specially).

With respect to the first component, "[i]n determining whether an organization has an enforceable obligation to perform a charitable service, we look to both its charter or organizational statements and its actions taken pursuant to those statements." MacDowell Colony, 157 N.H. at 7 (quotation omitted). MBNH's Articles of Agreement and by-laws provide that "[t]he object for which [MBNH] is established is to offer" religious, educational, recreational and charitable services "to persons of whatever race, nationality, ethnic background, state or nation of residence." Both also state that "this corporation shall provide opportunities to meet primarily the spiritual, cultural and physical needs of youth." (Quotations omitted; emphasis added.) Even if those documents alone did not "sufficiently circumscribe [MBNH's] discretion and define an enforceable charitable obligation," ElderTrust, 154 N.H. at 700, we conclude that Camp Marist's long history of operating in accordance with its charitable mission does. See Appeal of City of Franklin, 137 N.H. 622, 626 (1993) (decided under prior law) (concluding that the taxpayer evidenced that it is obligated, by its charter or otherwise to provide low cost care for the elderly where board of tax and land appeals found taxpayer provided consistent record of having provided such care for more than fifty years).

Here, MBNH has operated a summer camp on the Property since its first season in 1950. Evidence was introduced as to the mission of Camp Marist and how Marist Brothers' precepts are implemented at the camp. We note that, although the trial court questioned the relevance of "the history from 150 years ago at one end . . . [and] the future . . . at the other end," as MBNH's counsel argued at trial, "it's how they carry on their work[,] [a]nd they've carried it on in the past and they'll carry it on in the future." We conclude, as a matter of law, that MBNH established that it is "obligated, by its charter or otherwise," to perform its stated purpose. Appeal of City of Franklin, 137 N.H. at 624 (quotation omitted).

We now consider whether MBNH performs its "stated purpose to the public rather than simply to [its] members." ElderTrust, 154 N.H. at 697-98. "[T]he test of the public character of a charitable institution is not that all of the public is admitted to its benefits, but that an indefinite number of the public are so admitted, [and] that its benefits are not restricted to its corporate

9

members . . . ." Sisters of Mercy v. Hooksett, 93 N.H. 301, 309 (1945) (decided under prior law); see also E. Coast Conf., 146 N.H. at 662 (same). We agree with the Massachusetts Supreme Judicial Court that, "although at any given moment an organization may serve only a relatively small number of persons, if that membership is fluid and is drawn from a large segment of society or all walks of life, the organization may qualify as charitable." New England Legal Foundation v. Boston, 670 N.E.2d 152, 159 (Mass. 1996) (citations omitted).

Here, the parties stipulated that Camp Marist draws about 500 children a year "from the United States, including the State of New Hampshire, and around the world." The youth served by MBNH, like the students in Garland School, "clearly constitute an indefinite class of persons. They would naturally change from year to year and . . . it could have been inferred [from the age range of children eligible to attend, that, over time,] they actually did." Garland School, 6 N.E.2d at 382. We conclude, as a matter of law, that MBNH satisfied both components of the second ElderTrust factor.

MBNH next contends that the trial court misapplied the third ElderTrust factor, which requires that, "in addition to being owned by the organization," the land "is occupied by it and used directly for the stated charitable purposes." ElderTrust, 154 N.H. at 698. The trial court found that this factor was not satisfied because the testimony did not establish that Camp Marist's off-season rentals "directly fulfill MBNH's charitable purpose, or are reasonably necessary for MBNH to accomplish its purpose." (Quotation and brackets omitted.) MBNH argues that its entitlement to a charitable tax exemption is not defeated by either its own limited seasonal use of the property, or its off-season rental of the property to others. See Green Acre Baha'i Institute v. Town of Eliot, 110 A.2d 581, 583 (Me. 1954) ("Exemption is not defeated by the fact that the use by the charitable institution for [its] own purposes is seasonal."); Senior Citizens Housing Dev. Corp. v. City of Claremont, 122 N.H. 1104, 1107 (1982) (decided under prior law) (observing that "not all types of rentals preclude a tax exemption"). MBNH also notes that "the lion's share of the 2015 off-season rental revenues ($92,854) was attributable to leases with Catholic educational institutions — organizations that actually do share the Marist Brothers's twin charitable missions of 'advancing education' and 'aiding religion.'" (Footnote omitted.)

The Town, on the other hand, contends that the evidence at trial "established that there are no restrictions on who can rent the Camp property, nor are there any restrictions on how the groups use the Property," and, therefore, established that the rentals do not directly fulfill MBNH's charitable purpose and are not necessary for MBNH to accomplish that purpose. The Town cites our decision in Alton Bay Camp Meeting Association v. Alton, 109 N.H. 44 (1968) (decided under prior law), in which we held that certain property owned by the plaintiff Association, but occupied by owners of cottages built thereon, would not qualify for a charitable tax exemption where "the

10

cottage owners, by virtue of their lease, are entitled as of right to use and occupy this land directly for their own purposes." Alton Bay Camp Meeting Asso., 109 N.H. at 49-50. This unrestricted right, we concluded, "negatives a use and occupancy directly for charitable purposes by the association, which are essential requisites for an exemption." Id. at 50.

We need not consider either the lack of restrictions on who may rent the property at issue, or the allegedly charitable nature of the organizations that account for the "lion's share" of actual rentals. "To qualify for an exemption, [the Property], in addition to being owned by [MBNH], would have to be occupied by [MBNH] and used directly by [MBNH] for its charitable purposes." Id. at 49 (emphasis added). Rental of the property to others will not defeat entitlement to a charitable exemption so long as "the rentals directly fulfill the organization's charitable purpose, or are necessary for the organization to accomplish its purpose." Senior Citizens Housing Dev. Corp., 122 N.H. at 1108. On the other hand, "when property is owned and rented commercially as an adjunct to a charitable purpose, no tax exemption is allowed under RSA 72:23, V." The Housing Partnership v. Town of Rollinsford, 141 N.H. 239, 243 (1996).

We will assume, without deciding, that the trial court correctly found that the evidence failed to show that MBNH's 2015 off-season rentals directly fulfilled its charitable purpose, or were necessary for it to accomplish that purpose. See Senior Citizens Housing Dev. Corp., 122 N.H. at 1108. Nevertheless, MBNH argues for full tax exemption on grounds that "the 'dominant' or 'primary use' of the property embracing Camp Marist was certainly not off-season rentals, but rather the operation of a summer camp aimed at the educational and spiritual development of youth" and that its off-season rentals are "an 'incidental' use under Kiwanis." See Appeal of Kiwanis Club of Hudson, 140 N.H. 92, 95 (1995). In Kiwanis, we noted that, even "assuming arguendo that Kiwanis' use of the [property at issue] for its own fund-raising purposes would not fulfill Kiwanis' charitable purpose, that use is incidental to Kiwanis' primary use of the [property]," which, we had previously concluded, directly fulfilled Kiwanis' charitable purpose. Id. "As a result," we held, "Kiwanis [was] entitled to a full exemption from property taxes for the [applicable] tax year." Id.

The Town counters that MBNH's off-season rentals "are not merely an incidental use of the property." It asserts that "[i]n 2015, [MBNH] rented its property to six (6) different organizations for a total of twenty-six (26) days. This is roughly half of the time when the property is devoted to summer camp use, which is approximately 49 days (7 weeks)."

Our cases neither define "incidental use" nor instruct as to what criteria should be used to determine whether a use is "incidental." In Kiwanis, the use we characterized as incidental consisted of fund-raising on the property one

11

night a week, "business meetings twice a month, several special meetings throughout the year, and a community Christmas party for underprivileged children once a year." Kiwanis, 140 N.H. at 93. The primary use took place four nights a week. Id. We did not, however, explicitly rest our distinction between primary and incidental uses on a temporal division between them. See id. at 95. Moreover, for reasons discussed below, we find the quantification urged by the Town to be particularly inappropriate for the property at issue here.

In determining whether a use is "incidental," we find the Maine Supreme Judicial Court's decision in Hebron Academy, Inc. v. Town of Hebron, 60 A.3d 774 (Me. 2013), instructive. There, the court explained:

> Property may be "occupied or used solely for" an organization's own tax-exempt purposes if its use for non-exempt purposes is sufficiently "incidental" to the organization's tax-exempt purposes. Our decisions have recognized two types of "incidental use" that qualify for this exception.
>
> . . . .
>
> The first type of incidental use relates to institutional necessity, and involves property uses that are appurtenant to an institution's major tax-exempt purpose. . . .
>
> . . . .
>
> The second type of incidental use that does not preclude the exemption involves de minimis uses of property that do not interfere with the institution's major tax-exempt purpose.

Hebron Academy, Inc., 60 A.3d at 781-82. MBNH asserts the second type of exception here.

We begin with the requirement that the asserted incidental use does "not interfere with the institution's major tax-exempt purpose," id. at 782, as it highlights why the approach we take here is more suited to the property at issue than is the Town's approach, i.e., comparing the number of days devoted to the alleged incidental use to the number of days devoted to the primary use. As examples of the second exception, the Hebron court cited, first, a case in which "a non-profit summer camp's rental of its facilities to organizational officers was an 'incidental use' not precluding exemption where the camp charged a nominal fee and rented the facilities only when otherwise vacant," id. (citing Salvation Army v. Town of Standish, 709 A.2d 727 (Me. 1998)), and, second, a case affirming a "tax exemption for a non-profit summer camp that leased its property in the off-season," id. (citing Episcopal Camp Foundation v.

Town of Hope, 666 A.2d 108 (Me. 1995)).  The rationale for allowing such off-season rentals was articulated long ago by the New York Court of Appeals in a case dealing with off-season leasing of the property of a school:

> We think the plaintiff did not waive or forfeit the [tax] exemption . . . by leasing the building and premises during the usual vacation period in the summer for a boarding-house.  The policy of the exemption is the encouragement of learning.  This policy is not subverted, but on the contrary is promoted by permitting the plaintiff to devote the premises to a profitable use during the summer months when they are not needed and cannot be used for the purposes of a school.  If the premises should be left wholly vacant during this time, it is not pretended that the property could be taxed.  By leasing the premises during the summer the corporation is enabled to increase its income applicable to the purposes of its creation.

Temple Grove Seminary v. Cramer, 98 N.Y. 121, 126 (1885) (citation omitted); cf. St. Paul's Church v. Concord, 75 N.H. 420, 426 (1910) (concluding, under prior law, that "an occasional and temporary occupation by third parties who pay for the privilege [did not] deprive[] the property of its nontaxable character" as a house of public worship and that "[i]f there is no substantial abandonment of the property by the church to uses other than those it was designed to promote, the receipt of pay for its temporary use, when not needed or desired for religious services, is merely incidental and subsidiary").

Here, Camp Marist is a residential summer camp on Ossipee Lake that serves children aged six to sixteen.  The availability of its school-aged clientele and, presumably, the occurrence of appropriate weather conditions for running a lakeside summer camp, limit Camp Marist's operating season to late June through mid-August — in other words, during summer vacation for school children.  The use asserted to be incidental is off-season rental of the Property.  Accordingly, it does not interfere with the operation of Camp Marist, the primary use by which MBNH accomplishes its charitable purposes of "advancing education and aiding religion."

We next consider whether MBNH's off-season rentals are a "de minimis use[] of [the] property."  Hebron Academy, 60 A.3d at 782.  In Hebron Academy, the court concluded that the property rentals at issue were de minimis where "the trial court found that Hebron Academy's rental activity amounted to approximately one percent of its operating budget."  Id.; cf. People v. Haring, 170 N.E.2d 677, 678, 681 (N.Y. 1960) (farm property on which a religious organization produced food to feed "students, teachers, workers and members of the religious body" did not lose tax exemption due to selling "a small part (5% to 10%) of the farm produce," characterized as "incidental and insubstantial," as surplus).

13

The trial court found that MBNH's total expenses for 2015 were $1,255,313. Thus, approximating[1] the measurement used in Hebron Academy, MBNH's off-season rental income of $92,854 that year amounted to approximately 7% of total expenses. See Hebron Academy, 60 A.3d at 782. When calculated as a percentage of total revenue for 2015, which the trial court found was $1,363,200, the figure drops to less than 7%. We conclude that this use was de minimis. Cf. id.; Haring, 170 N.E.2d at 678. Accordingly, because off-season rentals did not interfere with MBNH's primary charitable purpose and were a de minimis use, we conclude that they were an incidental use. Hebron Academy, 60 A.3d at 782. Because such incidental use does not negate entitlement to a full charitable tax exemption, see Appeal of Kiwanis Club, 140 N.H. at 95, we hold that the trial court erred in concluding that MBNH's off-season rentals precluded a tax exemption here.

We now consider whether MBNH's primary use of the Property satisfied the third ElderTrust factor, which "primarily asks whether the charitable purpose identified under the first factor is being carried out on the particular parcel of property for which the exemption is being sought." ElderTrust, 154 N.H. at 700-01. To satisfy this factor, "the occupancy of the property must be reasonably necessary for the charitable organization to carry out its mission," and the use must not be "slight, negligible or insignificant, or not in the performance of the public purpose." Id. at 701. For the many reasons articulated above, we conclude, as a matter of law, that MBNH's use of the Property to operate Camp Marist meets these criteria and, accordingly, that MBNH satisfies the third ElderTrust factor.

MBNH next argues that the trial court erred in concluding that its annual contribution to U.S. Province disqualifies it from an exemption under the fourth ElderTrust factor, which asks whether "any of the organization's income or profits are used for any purpose other than the purpose for which the organization was established" and precludes exemption if "the organization's officers or members . . . derive any pecuniary profit or benefit." Id. at 698. MBNH contends that the annual contribution is "aimed at stabilizing (meaning ensuring the survival of) each" U.S. Province ministry, including Camp Marist, and that the payment reflects: (1) "the value of the financial stabilization furnished by" U.S. Province; (2) "the uncompensated service of those who acquired, established, built, and have since directed, managed and staffed Camp Marist"; and (3) "additional financial benefits" to MBNH from U.S. Province in the form of health, property and liability, and motor vehicle insurance as well as accounting services. MBNH asserts that "the 2015 contribution does not approach the value of the benefits conferred" on Marist Brothers by U.S. Province and contends that "payment of reasonable

---

[1] While Hebron Academy used operating expenses in its calculation, no testimony on operating expenses was presented in this case. Accordingly, we use the total expenses figure testified to by Marist Brothers' chief financial officer.

compensation to members for their service," <u>Young Women's Christian Ass'n v. Portsmouth</u>, 89 N.H. 40, 44 (1937), does not disqualify it from a charitable exemption.

The Town, on the other hand, argues that the trial court "correctly found that [MBNH] presented insufficient evidence to support a finding that the amount of the assessments <u>is related to</u> the value of the benefit [MBNH] receives from . . . U.S. Province." (Emphasis added; bolding omitted.)  The trial court found:

> [T]he evidence regarding how the assessment is calculated and used was murky at best.  Although MBNH offered general testimony regarding "stabilization" and the benefits it receives as the result of its affiliation with . . . U.S. Province, it does not appear that the amount of the assessment <u>is directly tied to</u> the value of these benefits, but is instead, according to [MBNH's chief financial officer's] testimony, . . . determined based upon the financial health of MBNH.

(Emphasis added.)

Both the trial court and the Town misconstrue Marist Brothers' position on the assessments to U.S. Province.  Marist Brothers does not contend that the assessment is "related to" or "directly tied to" the value of the benefits it receives from U.S. Province but, rather, asserts that the latter far exceed the former.  As MBNH explained in its trial memorandum:

> U.S. Province . . . (a) purchased the Lake Ossipee property for the non-profit that it established, (b) built the physical plant and facilities of Camp Marist, (c) devoted the uncompensated service and labor of its Brothers, as builders and summer staff, (d) furnished management and professional services, and (e) otherwise subsidized its operations in each of the last sixty-six (66) years.

Viewed in the context of MBNH's assertion that the benefits received from U.S. Province greatly exceeded the assessment, evidence that the amount of the assessment is calculated annually "based upon the financial health of MBNH" is neither inconsistent with that assertion nor a factor disqualifying MBNH from a tax exemption for the year in question.  Instead, the evidence is fully consistent with MBNH paying all that it can afford[2] toward reimbursing U.S. Province for benefits to MBNH — accrued over the course of its corporate existence — that exceed its ability to pay.

---

[2] As noted previously, MBNH had net income of $107,907 in 2015 and paid an assessment of $106,000 to U.S. Province that year.

While testimony was not heard on every point, the evidence at trial generally corroborated MBNH's assertions regarding the benefits provided by U.S. Province. For instance, with respect to MBNH's assertions that U.S. Province purchased the Property, constructed the facilities on it, and provided unpaid staffing and labor by its Brothers, the evidence substantiated U.S. Province's founding role. The parties stipulated that "U.S. Province . . . has founded and/or staffed and funded educational ministries, open to youth of all faiths, throughout the United States." The trial court found that "U.S. Province established MBNH in connection with the acquisition, development and operation of Camp Marist." MBNH's chief financial officer (CFO) affirmed Town counsel's suggestion that U.S. Province "could have purchased the camp in New Hampshire under that corporate name . . . [but] at some point . . . a decision was made to create a New Hampshire entity." The trial court also found that "[i]n the early days, [Camp Marist] was staffed almost exclusively by Marist Brothers who worked without compensation." Furthermore, while some staff at present are paid employees, the camp is also still staffed by Marist Brothers, "who receive no compensation aside from room and board."

With respect to MBNH's assertion that U.S. Province provides it financial benefits such as insurance, the trial court found that U.S. Province "purchases group property insurance and auto insurance for its ministries, which the ministries then pay for, allowing each ministry to pay less for insurance than it would if it purchased insurance on its own." The CFO testified that in 2015, U.S. Province charged MBNH $58,000 for property liability insurance that would have cost MBNH over $100,000 if it "was a stand-alone." When asked how he determined the price charged to MBNH, the CFO responded that when he "started the job 12 years ago, [U.S. Province was] charging Camp Marist $58,000, and [he] kept it the same since [he has] been doing the job." With respect to motor vehicle insurance, the CFO testified that he "decided just to charge Camp Marist $300" per vehicle for coverage under a group policy for which "[t]he actual insurance bill for the Province was $1200 for each car that we own." Thus, the testimony indicated that U.S. Province does not just pass along the savings it obtains by insuring all of its ministries, but actually subsidizes Camp Marist's insurance costs.

With respect to the asserted benefit MBNH characterized as a "stabilization program" at trial, MBNH's bylaws obligate it to "make contributions to [U.S. Province] to provide support to the religious works and health and well-being of the Marist Brothers who have founded and assisted [MBNH] in meeting the spiritual, cultural and physical needs of the youth served." Each of U.S. Province's ministries, except a retreat house in New York, is charged an assessment similar to that charged MBNH. The assessments are deposited in U.S. Province's general operating fund and, as the trial court found, are "used, generally, to support all of the U.S. Marist ministries when needed." This "stabilization program" appears to function as a group self-insurance of sorts. Thus, the trial court noted, and apparently

credited, evidence that if Camp Marist "were to have some shortfall, as it did in 2008 when several buildings were destroyed during a snowstorm, . . . U.S. Province would help the Camp financially." (Quotation omitted.) According to the executive director's testimony, the 2008 financial assistance consisted of U.S. Province covering the $75,000 insurance deductible for the collapsed buildings.

Finally, the court found that U.S. Province uses funds in its general operating account "to provide health insurance for the Brothers, both active and retired, and to support the living expenses of retired Brothers." Thus, similar to the "stabilization program" described above, this use of assessment funds appears to operate as a pension of sorts. To the extent that Brothers of MBNH benefit from that "pension," as well as from the health insurance, MBNH's contribution via the annual assessment is analogous to, as MBNH contends, "payment of reasonable compensation to members for their service in the maintenance and conduct of its affairs." Id. We conclude that this evidence of benefits provided by U.S. Province compels a finding that MBNH's payment of the 2015 annual assessment is not inconsistent with the requirement that neither any of its officers or members, nor any related organization, including U.S. Province, "derive any pecuniary profit or benefit," ElderTrust, 154 N.H. at 698, from its operations.

We note that courts in other jurisdictions have held that similar payments for assistance by a parent organization did not preclude a charitable tax exemption. In Lehighton Area School District v. Carbon County, 708 A.2d 1297 (Pa. Commw. Ct. 1998), for instance, the District argued that monies transferred by the taxpayer (Hospital) to an affiliated entity (Health East) from 1987 to 1991 precluded Hospital from qualifying for a charitable tax exemption. Lehighton Area Sc. Dist., 708 A.2d at 1306. The court disagreed:

> The record reveals that the Hospital did transfer approximately $550,000 to Health East each year in 1989 and 1990 and that the Hospital paid that corporation $200,000 for development of a computer system. The District, however, ignores the fact that the Hospital received substantial services and grants in return for those transfers. The Hospital received a package of management services, which the Common Pleas Court found could not be produced by the Hospital "in-house." Also, the Hospital received $575,000 in grants from Health East and a membership in the Voluntary Hospitals of America. The membership saved the Hospital between $70,000 and $100,000 each year in purchasing discounts. In addition, the Hospital gained access to fifteen medical specialists. All the above benefits, in our view, supported and increased the efficiency of the Hospital. Because the Hospital received substantial benefits in return for the funds transferred to Health East, which benefits supported and enhanced the

17

functioning of the Hospital, we hold that the Hospital qualified for a tax exemption under Section 204 of the Law.

Id.; see also Affiliated Medical Transport v. Tax Com'n, 755 S.W.2d 646, 650 (Mo. Ct. App. 1988) (concluding that tax commission's finding that the taxpayer "returned a net profit of $32,000.00 from its emergency medical transportation services fails to consider the [corporate parent's] costs in acquiring the assets to be used by [the taxpayer] and the capital expenditures of $300,000.00 by the [corporate parent]"); Appeal of Community General Hosp., 708 A.2d 124, 130-31 (Pa. Commw. Ct. 1998) (concluding that the taxpayer was entitled to charitable tax exemption where, "[a]lthough [the taxpayer] pays [its corporate parent] a hefty fee each year for management services, the consideration that [the taxpayer] receives from [its parent company] far exceeds the value of that payment[;] . . . [s]uch a reciprocal arrangement is not the equivalent of transferring surplus revenues to a related entity that does not operate free of the profit motive").

To the extent the Town argues that MBNH's allowance of "up to fifty (50) to sixty (60) children or relatives of camp employees and brothers to attend the camp for free each summer, some for multiple weeks[,] . . . provides a further pecuniary benefit to members of the organization," we disagree. First, there was no evidence that the lay staff of Camp Marist who are paid for their services are members of MBNH and, in fact, MBNH's bylaws would indicate otherwise. As found by the trial court, the bylaws direct that the corporation's members "shall be the Major Superior (Reverend Brother Provincial), and Provincial Council of the United States Province of the Religious Institute of the Marist Brothers of the Schools." (Quotation omitted.) As for the Marist Brothers, even assuming they could be considered members of MBNH, they receive no compensation other than room and board. Thus, free camp attendance for the Brothers' relatives would constitute nothing more than "payment of reasonable compensation to members for their service," Young Women's Christian Ass'n, 89 N.H. at 44. For all of the foregoing reasons, we conclude there was no evidence that MBNH's "officers or members . . . derive[d] any pecuniary profit or benefit" from MBNH or Camp Marist. ElderTrust, 154 N.H. at 698.

The fourth ElderTrust factor also asks whether "any of the organization's income or profits are used for any purpose other than the purpose for which the organization was established." Id. The trial court stated that it "heard no testimony that . . . U.S. Province uses the money from the assessment to advance MBNH's mission of 'advancing education' and 'aiding religion.'" The Town similarly argues that if MBNH's "purpose is to provide opportunities to meet primarily the spiritual, cultural and physical needs of youth,' it is difficult to reconcile how making unrestricted payments to . . . U.S. Province furthers this purpose in any meaningful way."

18

MBNH counters that both the Town and the trial court fail to recognize that U.S. Province is "entirely aligned with MBNH's charitable purposes." We agree with MBNH, as uncontroverted evidence and the trial court's own findings support its position. The trial court found that U.S. Province "operates a number of ministries throughout the United States, all of which share the general mission of educating and spreading the gospel of Jesus Christ to youth." (Citations omitted; emphasis added.) It further found that "[i]n addition to Camp Marist, . . . U.S. Province has seven high schools and a retreat house in Esopus, New York which is used for weekend retreats in the winter and[, in the summer,] as a camp for children that are deaf, or have cancer, AIDS, or special needs." Camp Marist's Director of Mission testified that "[t]he education and the religious instruction of youth would be [the mission of] all Marist Brothers, all Marist ministries." He also testified that "[t]he mission of Camp Marist fits into all the ministries of the Marist Brothers. . . . [T]he mission of all Marist ministries is to work with youth to spread the gospel message to youth. That's the purpose of Camp Marist and all of our Marist schools."

The trial court found that each ministry of U.S. Province, except the retreat house in Esopus, is charged an assessment. As noted above, MBNH contends, and the evidence generally corroborated, that the assessment is "aimed at stabilizing (meaning ensuring the survival of) each" U.S. Province ministry. Thus, the CFO testified that, similarly to subsidizing Camp Marist for the 2008 building collapse, U.S. Province has subsidized other Marist ministries. The CFO also testified as to insurance benefits provided to other Marist ministries, in addition to Camp Marist, through the purchase of group policies. Finally, as noted above with respect to Camp Marist, provision of health insurance and an internal pension system for Marist Brothers who work at U.S. Province's various ministries is analogous to "payment of reasonable compensation to members for their service in the maintenance and conduct of its affairs," Young Women's Christian Ass'n, 89 N.H. at 44.

We see no reason to assume that these payments to or on behalf of other U.S. Province ministries do not help those ministries further their mission in the same way that such payments assist Camp Marist. Insuring, financially stabilizing, and reasonably compensating the staff of these ministries, as testified to by the CFO, would appear to do nothing more than maintain the viability and functionality of these missions. No evidence adduced at trial suggested a contrary purpose or result. And because, as the trial court found, all of U.S. Province's ministries "share the general mission of educating and spreading the gospel of Jesus Christ to youth," there was no evidence that any of MBNH's "income or profits [were] used," by means of the assessment to U.S. Province or otherwise, "for any purpose other than the purpose for which [MBNH] was established." ElderTrust, 154 N.H. at 698. We conclude for the foregoing reasons, that the fourth ElderTrust factor was met.

Having concluded that MBNH satisfied all of the <u>ElderTrust</u> factors, we reverse the trial court's decision and hold that MBNH is entitled to a charitable tax exemption under RSA 72:23, V for the 2015 tax year.  In light of this holding, we need not address MBNH's challenge to the trial court's ruling on the motion <u>in</u> <u>limine</u>.

<u>Reversed</u>.

LYNN, C.J., and BASSETT and HANTZ MARCONI, JJ., concurred.